## MAUGER et al. v. SLAVIN.

(Supreme Court, Appellate Division, Third Department. December 15, 1896.)

SALE—FRAUDULENT REPRESENTATIONS—QUESTION OF FACT.

It is error to direct a nonsuit where there is evidence that the goods sought to be recovered were sold to defendants on representations made by them as to their financial condition; that they were material, and relied on by plaintiffs; and that defendants knew, or had reason to believe, that they were false.

Appeal from trial term, Albany county.

Action by Nicholas Mauger and another against Thomas Slavin, assignee for the creditors of Pilling & Scullen. From a judgment on a nonsuit, plaintiffs appeal. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Henry A. Strong, for appellants.
P. D. & Smith Niver, for respondent.

MERWIN, J. This action was brought to recover the possession of 1,100 pounds of wool, being part of a lot of 3,000 pounds sold and delivered by the plaintiffs to Pilling & Scullen, the assignors of the defendant, on the 9th May, 1895. On the 24th May, 1895, Pilling & Scullen made a general assignment for the benefit of creditors to the defendant, Slavin. The plaintiffs thereupon demanded of the defendant the wool in question, which came to his possession as assignee; and, upon his refusal to deliver, this suit was brought, upon the theory that the purchase by the assignors from the plaintiffs was induced by fraudulent representations of the assignors as to their solvency. The nonsuit was granted, upon the ground that the evidence was not sufficient to authorize the jury to find that the purchase by the assignors was fraudulent.

Pilling & Scullen were engaged in the manufacture of knit goods at Cohoes, and the plaintiffs did business in New York. Prior to the transaction in question, the plaintiffs had not sold any goods to Pilling & Scullen except one or two small lots, and did not know what their financial credit or standing was. On May 3, 1895, P. & S. wrote plaintiffs, asking if they had the kind of wool such as the small lot previously bought, and said:

"We are to use 6,000 lbs. that we know of now. Do you want to sell us this in two bills, 3,000 lbs. each, on 4 months, int. after 60 days, at the lowest price you would to any one?"

To this the plaintiffs replied, declining to sell on four months' time. On May 6, 1895, P. & S. wrote plaintiffs as follows:

"Now, gentlemen, we want and shall get 6,000 lbs. of Aus-lambs, such as or very similar to what we had from you. We are buying on 4 mos. (our note, int. after 60 days). We want it in two 3,000 lbs. shipment, as we try to make our payments easy, so that we be on time when due. We certainly expect to pay our bills at maturity. If we thought otherwise, Mauger & Avery would be the last men we would buy from. We don't care to make statements of our exact standing to every one we buy from. We do not own the mill; have had to put in some thousands of dollars in new machinery (paid for); and we are easy in money matters to-day; still, we are not S. S. Fisher. No doubt, you know of our various men we have bought from. To any of them we refer you. Ask if we are prompt in our payments,—Goodhue & Co., Alfred Smith, Reifsnyder & Co. If you send the wool, send 3,000 lbs. at once, as we have sold goods to deliver, and must get them out soon."

On May 8, 1895, P. & S. wrote plaintiffs as follows:

"Yours of yesterday received. The writer notices you would make trade not only a debt, but a debt of honor. Be it so. Please send 3,000 lbs. of the wool at once, and we will send our note for 4 months, interest added after 60 days. There is surely a great deal of wool sold in Cohoes on 4 months, to what are considered good, reliable people. Please ship so that we get the stock early, as we have to deliver part of the goods in June."

The goods were sent on the 9th of May, and there is evidence that the plaintiffs relied on the statements contained in the letters, and believed them to be true, and acted upon them accordingly.

There is evidence which would authorize the finding that P. & S., when they obtained these goods, were, in fact, largely insolvent, and that they knew or had good reason to believe that such was their condition. Their rent was past due to the extent of $1,000 and upward, and they had no available means to meet it. They had drawn on the commission house or houses that they were sending their goods to for sale, to the full extent that they would advance. They sold no goods themselves except as they were sent to the commission houses. One of the firm testifies that all they drew between the 1st day of May and the date of the assignment was the sum of $1,600; and that, the partners used themselves, for their own wages. Under the arrangement they had with the commission houses, the advances were not equal to the actual cost price of manufacturing the goods. The arrangement was that advances should be made to the extent of two-thirds of the selling price. A reduction of the amount of advances, by reason either of the selling price being lower, or the rate of advance being decreased, precipitated the failure of the firm. They did not, in terms, say that they were solvent, but it might be found from the evidence that they designed the plaintiffs should so believe. "One who uses words in a deceptive and double sense, for the purpose of misleading the party with whom he contracts, is bound by them in the sense in which he intended they should be understood." Johnson v. Hathorn, 2 Abb. Dec. 468, and cases cited. They asked the plaintiffs to send the goods at once, "as we have sold goods to deliver, and must get them out soon." They had not, in fact, sold any goods. They only had an arrangement with a commis-

sion house to take the goods, and sell them, and had been informed by an agent of the commission house that the goods could be sold as soon as received. Filling orders for purchases actually obtained is one thing, and sending to a commission house with assurances of future sale is quite another. Whether the explanation given for this variation from the truth was sufficient to indicate no intent to deceive the plaintiffs was a question for the jury. It is readily apparent that the plaintiffs might be willing to sell if the buyers were to realize the full price of the manufactured article as soon as it could be made, and might not be willing to sell if the payment of the price depended on the hazards of a future sale on commission.

"In the cases of Meyer v. Amidon, 45 N. Y. 169, and Oberlander v. Speiss, Id. 175, the general rule was recognized that an action for fraudulent representations cannot be maintained without proof that the defendant believed, or had reason to believe, at the time when he made the representations, that they were false, and, consequently, that they were fraudulently made." Stitt v. Little, 63 N. Y. 432. See, also, Wakeman v. Dalley, 51 N. Y. 35; Duffany v. Ferguson, 66 N. Y. 484; Salisbury v. Howe, 87 N. Y. 135; Story, Sales, § 165. The fact that one has reason to believe his statement to be false is evidence tending to prove the fraudulent intent, and that is a question of fact for the jury. Salisbury v. Howe, supra; Smith v. Acker, 23 Wend. 658; Francheris v. Henriques, 24 How. Prac. 166.

In the present case, under the circumstances appearing in the record before us, it was, I think, a matter for the jury to determine whether Pilling & Scullen, as an inducement to the purchase from plaintiffs, made representations as to their financial condition that were material, and relied upon by the plaintiffs, and were false to the knowledge of Pilling & Scullen, or which they had reason to believe were false, and were made with a fraudulent intent. The judgment should therefore be reversed.

Judgment reversed, and new trial granted; costs to abide the event. All concur.