THE COMMONWEALTH FUEL COMPANY *vs.* KENNETH W. MCNEIL.

*First Judicial District, Hartford, May Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

A plaintiff is not bound to prove all the fraudulent representations alleged in his complaint, it being sufficient if he proves any material representation which in fact served as an inducing cause.

The truth or falsity of alleged fraudulent representations is to be determined in the light of the meaning which the plaintiff might reasonably attach to them under all the circumstances.

The commencement of an action for breach of contract is not inconsistent with the maintenance of a subsequent action to recover damages for fraud arising out of the same transaction, since each involves an affirmation of the contract.

When the trial court fixes the amount of a recovery upon the basis of one of two or more conflicting rules for measuring damages, it should clearly state which one it has adopted and applied.

*Transferred from Third Judicial District.

Commonwealth Fuel Co. *v.* McNeil.

A tort committed in one State creates a right of action that may be sued upon in another unless its public policy forbids.

In an action brought in this State for a tort committed in another jurisdiction, the damages are to be measured according to the law of the place of the injury.

After the plaintiff, a Pennsylvania corporation, had contracted to sell 50,000 tons of coal to the A. Co., a Connecticut corporation, of which the defendant was the virtual owner, and when only 12,900 tons had been delivered and paid for, the defendant represented to the plaintiff that because the A. Co. was in serious financial difficulties and because a number of its creditors were about to institute receivership proceedings, it would be unable to further perform its contract or to pay substantial damages for its breach; and the defendant thereupon suggested that the plaintiff assign the A. Co. agreement to a person to be designated by him and that it enter into a new contract for the sale of 60,000 tons of coal to the B. Co., a New York corporation, also controlled by the defendant and represented by him to be in sound financial condition and of excellent credit standing. In reliance upon the defendant's statements, all made in the State of New York, the plaintiff acceded to this proposal, having first made arrangements with the M. Co., from which it had contracted to purchase the coal to be delivered to the A. Co., for the cancellation of its existing obligations and the substitution of a new order for the 60,000 tons necessary for its performance of the B. Co. contract. Thereafter the plaintiff made delivery to the B. Co. of 12,614 tons, but the trade acceptances, given by the B. Co. in payment, were dishonored, and the B. Co. refused to accept further instalments or to furnish, as it was bound to do by its contract, security for future payments. The trial court found that the representations made by the defendant concerning the financial condition of both the A. Co. and the B. Co. were false and fraudulent and made with the intent to induce the plaintiff to exchange its valuable contract rights against the A. Co., for the worthless obligations of the B. Co.; concluded that the defendant was liable for the injury resulting to the plaintiff from this fraud; and assessed the damages as the difference between the contract price and the market price of the undelivered coal under the B. Co. contract. *Held:*

1. That the defendant's attack upon the trial court's finding involved corrections and additions which, for the most part, were not within the province of this court to make.

2. That such corrections of the finding as could properly be made were ineffective to change the ultimate conclusion of the trial court.

3. That it was a necessary inference from the recitals contained in the contracts, and from the defendant's own testimony, that

Commonwealth Fuel Co. *v.* McNeil.

throughout the entire transaction, he knew of the plaintiff's course of dealing with the M. Co., although such knowledge was not expressly found by the trial court.

4. That the defendant's assumption, pervading most of his argument in this court, that the trial court's conclusions must necessarily be erroneous because a mathematical calculation based upon the assets and liabilities of his companies would yield results inconsistent with them, was fallacious, since the trial court was amply justified in weighing these figures in the light of the multitude of additional relevant facts before it, including the true nature of many of the claimed liabilities which were subsequently settled for a fraction of their face value, the existence of available assets not carried upon the corporate books, the purpose of the defendant in organizing his numerous companies, his use of them to effect improper distributions of profits, his concealment of facts from his own business associates, and the unreliability of his own and his witnesses' testimony.

5. That the trial court erred in failing to measure the plaintiff's damages according to the law of the State of New York, which entitled it to the difference between the value of that with which it parted, because of the defendant's fraud, and the value of that which it received.

6. That, applying this principle to the facts in the present case, judgment should have been rendered for the plaintiff to recover the value of its lost right of action against the A. Co. plus the amount of its existing obligations under its second contract with the M. Co., since those obligations represented losses within the reasonable contemplation of the parties; and that since the result so obtained exceeded the damages assessed by the trial court, the judgment was not reversible upon the defendant's appeal.

Argued May 8th—decided October 9th, 1925.

ACTION to recover damages for fraudulent representations alleged to have been made by the defendant, brought to the Superior Court in Fairfield County and tried to the court, *Wolfe, J.;* judgment for plaintiff for $75,865, and appeal by defendant. *No error.*

On November 22d, 1920, the plaintiff, a Pennsylvania corporation, entered into a contract with the Archibald McNeil and Sons Company, Incorporated, a Connecticut corporation, which we shall hereafter call the Connecticut company, for the sale to it of

50,000 tons of coal at $6 a ton "f.o.b. at the mines," to be delivered, 10,000 tons in November, 1920, and the same amount in each of the four succeeding months. Both corporations were engaged in the business of dealing in coal at wholesale. All of the stock of the Connecticut company except a few shares, was owned by the defendant. The plaintiff was not a coal producer, but it at once made a contract itself to purchase the same amount of the Mayer Brick Company, a mine operating company. In November and December, the plaintiff delivered to the Connecticut company 12,902 tons, which were accepted, and for which payment was made. The Connecticut company, in addition to its domestic business, had in 1919, 1920, and until May, 1921, a large foreign business, and had in the spring and summer of 1920, chartered a number of vessels to transport coal to foreign ports, but, by reason of a strike, it was unable to secure the coal to ship in them. This resulted in an accumulation of demurrage claims amounting to $1,616,783.53, the bringing of suits against the company for the recovery of $383,000 damages, and the attachment of its cargoes of coal at Baltimore on November 16th, 1920. The defendant, on November 20th, 1920, caused to be organized the Archibald McNeil and Sons, Inc., of New York, a New York corporation, which we shall hereafter call the New York company, and other corporations similarly organized under the laws of other States, in order to avoid attachments by holders of demurrage claims against the Connecticut company and to preserve its assets and enable him to carry on its business. The capital of the New York company was provided from funds of the Connecticut company, and prior to December 31st, 1920, the defendant caused to be transferred from the Connecticut company to the New York company assets amounting in value to more than

$1,000,000, and thereafter a considerable part of the business theretofore transacted by the Connecticut company to be transacted through the latter company, and the assets and liabilities of these companies to be intermingled as the defendant directed. From this time the New York company had no actual corporate existence separate from or independent of the Connecticut company.

After the deliveries of coal made by the plaintiff in November and December, 1920, the Connecticut company, on and after January 1st, 1921, refused to take any of the 37,098 tons of coal remaining to be delivered under the contract, despite repeated requests by the plaintiff that it do so. The plaintiff was then and thereafter able and willing to make deliveries as called for by its contract. The defendant, between February 9th and April 29th, 1921, represented to the plaintiff that the Connecticut company was in serious distress financially, that a number of creditors of it were about to apply for a receiver, and that because of these facts, it could not take and pay for further deliveries under the plaintiff's contract, or pay substantial damages for its breach. Defendant then suggested that plaintiff accept a cash settlement of the Connecticut company's liability under its contract, which plaintiff refused; defendant thereupon represented to plaintiff that he was connected with a corporation known as the United States Coal and Coke Corporation, hereafter called the Coke company, which was in sound financial condition, had first-class credit, owed no money, and carried substantial bank balances, and that if plaintiff would assign its claim against the Connecticut company to a nominee to be named by him, he would cause the Coke company to enter into a new contract for the purchase of 60,000 tons of coal, at a reduced price, and that, by reason of its financial

condition as he had represented it, that company would be able to perform such a contract. The plaintiff thereupon secured the offer of another contract with the Mayer Company for 60,000 tons of coal in place of the existing one, and upon the defendant renewing, in the form of a letter, his representations that the credit condition of the Coke company was first-class, that it owed no money, and carried substantial bank balances, the plaintiff did, on April 29th, 1921, enter into a new contract with it for the sale to it of 60,000 tons of coal, to be delivered at the rate of approximately 6,000 tons a month thereafter, at a price of $3.50 a ton for coal shipped from June 1st to November 1st, 1921, and $4.16⅔ for coal shipped from November 1st, 1921, to April 1st, 1922, in place of the $6 a ton price under its contract with the Connecticut company; and the plaintiff thereupon assigned its claim under that contract to the Karm Terminal Company of Connecticut, a corporation designated by the defendant and owned and controlled by him.

The plaintiff, under its contract of April 29th, 1921, shipped, at the direction of the Coke company, 12,614.5 tons of coal to the New York company for the June and July quotas under the contract, and received trade acceptances in payment, but the Coke company refused to take the August instalment, stopped payment on the trade acceptances, and did not pay for the coal shipped in June and July, although it had funds on deposit in banks sufficient to pay the same at least until later. The New York company did, in September, 1921, direct the plaintiff to resume shipments, but the plaintiff demanded, as it had a right to do under its contract, security for the payments which would become due, and upon defendant failing to furnish it, refused further deliveries. Thereafter plain-

tiff renewed its request for security, but defendant refused to furnish it, and plaintiff made no further deliveries of coal under this contract. The plaintiff was at all times able to deliver coal in accordance with this contract and willing to do so, provided the Coke company furnished such security. The representations made by the defendant to the plaintiff with respect to the financial condition of the Connecticut company between February 9th and April 29th, 1921, were false, made by him with knowledge of their falsity, and with the intention of creating a false impression in the plaintiff as to the actual financial condition of that company, and with the fraudulent intent of deceiving the plaintiff and inducing it to surrender its contract of November 22d, 1920, and its right to damages thereunder, either through a small monetary settlement or through the substitution of a new contract of more favorable terms for the defendant.

The representations made by the defendant with respect to the Coke company were false, known to him to be false, and made recklessly and with the intent of deceiving the plaintiff and of inducing the plaintiff to assign to the Karm Terminal Company the contract of November 22d, 1920, and to substitute therefor the contract of April 29th, 1921. All of these representations as to the Connecticut company and as to the Coke company were made as to matters of which the plaintiff had no knowledge or means of knowledge, and which plaintiff believed and in reliance upon which it was induced to surrender the contract of November 22d, 1920, with the Connecticut company, and enter into the contract of April 29th, 1921, with the Coke company.

*Homer S. Cummings* and *Jonathan Grout,* for the appellant (defendant).

*David S. Day* and *Philo C. Calhoun,* for the appellee (plaintiff).

WHEELER, C. J.   This action is brought to recover damages because of the representations made to the plaintiff by the defendant with reference to the Connecticut company and the Coke company, upon the ground that they were false and fraudulent.

Much of the contention of the defendant in this court consists in an attempt to secure corrections of the finding of the trial court.   Unless this attempt prevails to such an extent as to make the conclusions of the court erroneous, it is obvious, from a reading of the finding, that the plaintiff is entitled to a judgment, and the questions remaining concern the measure of the damages.   We have carefully examined the defendant's claims in the light of the testimony and exhibits, particularly the books of account, and we can discover few findings which were made without evidence to support them, and few facts not found, the evidence as to which required that they should be found.   Indeed, it is not within the province of this court to make most of the additional findings which the defendant desires.   *Dexter Yarn Co.* v. *American Fabrics Co.,* 102 Conn. 529, 129 Atl. 527.

Too much space would be required to discuss the defendant's claims in detail.   But if these corrections which we find upon the record before us should have been made, were made, they would be ineffective to change the trial court's conclusion that these representations as to the Connecticut company as alleged were proven, and were in fact false and fraudulent.

As to the representations concerning the Coke company, the defendant admits their making, as well he must in view of his having inserted them in a letter as well as having made them orally.   As to the financial

condition of the Coke company, the court finds that its only tangible assets on April 29th, 1921, were two bank accounts amounting to $12,738.03; that prior to that day it had not carried substantial bank balances, and that it had done no business calculated to give it a credit rating, and its credit was not first class. As to the bank balances on April 29th, 1921, a conclusion that these were not "substantial" as regards the company's obligation to take 6,000 tons of coal a month for ten months, at a price varying between $3.50 and $4.16⅔ a ton, could hardly be called unreasonable. The evidence clearly indicates that the company, started as a corporation but never completely organized, and treated as a partnership by the defendant and two of his associates, had done little else than buy coal to resell to the McNeil companies and charter vessels for them under an arrangement by which an excess price was charged by the owners of the vessels and paid to the Coke company to the profit of the three men, and that since January 1st, 1921, it had done no business. Certainly the court's conclusion of the falsity of the representation that its credit was first-class, understood as the plaintiff was entitled to understand it, must stand. The court has found that, on April 29th, 1921, the Coke company was indebted to the New York company to the amount of $210,000, but the evidence shows that this sum was transferred into the account of the Coke company from the funds of the New York company, in December, 1920, and was carried on a sheet in the "Accounts Payable" books of the latter as a sum due it until an offsetting credit was made in May, 1921; that the purpose of the transfer was clearly to secure a highly improper distribution of funds to the defendant and his associates, and that the whole transaction was clouded with subterfuge and concealment; and we cannot say that the trial court

was not entitled to consider that there was existing on April 29th, 1921, a real indebtedness on the part of the Coke company to the New York company, one such as a receiver of the latter seeking to follow funds improperly distributed might have enforced against the assets of the former. As regards the two Davies notes which the defendant claims ought to be regarded as assets of the company, the evidence clearly indicates that these were little more than evidence of advancements made to him on account of his share of the profits earned by the company, and might reasonably be regarded as wholly unenforceable. The representations as to the corporation being in a sound financial condition and as to its ability to perform its contracts, could well be regarded as carrying to the plaintiff an entirely false import. The finding does not state specifically that the defendant knew that the plaintiff had contracted with the Mayer Brick Company for the 50,000 tons of coal with which to carry out its contract of November 22d, 1920, nor that defendant knew that the plaintiff secured from the Mayer Brick Company a cancellation of this contract and the substitution in its place of a contract with the Mayer Company for the delivery of 60,000 tons with which to carry out its contract with defendant of April 29th, 1921, but these are conceded facts in the case and testified to by the defendant, and further, the knowledge of defendant is necessarily to be inferred from the references in the contracts of these dates; we accordingly treat them as facts in the case.

The consideration of the defendant's claims for corrections suggests two fallacies that lie largely at the bottom of his argument. Again and again, as bearing upon the financial inability of the McNeil companies to take and pay for plaintiff's coal, he contrasts the amount of the debts which their creditors claimed

against them and which did not appear upon their financial statements as liabilities, in the aggregate between two and three million dollars, with the amounts of their net surplus and capital stock appearing upon their statements of financial condition as of December 31st, 1920, $313,945.69 in the case of the Connecticut company and $60,050.64 in the case of the New York company. In the first place, the claims in question were not admitted liabilities on their part, but were largely disputed, and at least for the most part finally settled for a very small proportion of their face value; furthermore, those same statements show that the assets of the Connecticut company amounted to $3,749,193.90 and of the New York company to $2,228,337.87, and in determining whether or not the Connecticut company was in serious financial distress and was able to take and pay for plaintiff's coal or pay it damages, these figures, taken in connection with the fact that these were going concerns, are of far more significance than are those representing net surplus and capital stock. Again, the defendant treats the court's finding of subordinate facts from which it drew its conclusion of the falsity of the statements with reference to the McNeil companies as though their financial condition was to be determined by striking a balance of the assets and liabilities stated in the finding. In fact the conclusion of the court is plainly based, not alone upon a mathematical demonstration of the falsity of the representations upon the basis of the items found, but also upon an inference of available assets not apparent upon the books of the company and from the testimony of its officers, drawn from the various evidential facts recited. As supporting such an inference, the trial court no doubt was influenced to its conclusions by the manner and cause of the organization of the New York company already

referred to; the organization, origin and use of the Coke company; the organization and use by the defendant of the Wright Chartering Company, a partnership comprised of defendant and Townes and some of their relations, to carry on a business of securing and rechartering vessels to the New York company, to their profit, and to distribute to them by a devious channel $200,000 of funds paid to it by the New York company when the business had scarcely begun; the repudiation of the two contracts with the plaintiff coincident in each case with a large decrease in the market price of coal and the attempt to settle plaintiff's claim under its first contract for ten per cent. of it and the subsequent settlement of demurrage claims of over $1,600,000 for $300,000 as part of a money making scheme, and (at least as to the first contract) followed by extensive purchases of coal from others; a request by the defendant to a coal dealer in New York, while he was seeking a compromise with the plaintiff of its claims under the first contract, that if the latter was asked about the status of the McNeil companies he would "bear it" all he could; conflicting financial statements of the New York company made as of the same day; and the concealment from his own close associate Davies of the organization and profits of the Wright Chartering Company for the obvious purpose of preventing him from getting his proper share of these, and further, the inability of the trial court to credit defendant and Hugo, the bookkeeper and treasurer of defendant's companies. These considerations, and doubtless others which appear of record, were before the mind of the trial judge and point clearly to a concealment of the true facts as to the financial situation and abilities of the McNeil companies. In the light of these considerations, such

errors of the trial judge in making his findings as we have adverted to lose significance.

But the plaintiff's case does not necessarily rest there. Of the representations with reference to the Connecticut company, the defendant does not attack the finding as to the falsity of that one wherein the defendant stated that a number of its creditors were about to apply for a receiver; he does contend, indeed, that this was no more than to say that there was grave danger of a receivership, and that this was true; but if the truth of such a statement were admitted, still it falls far short of the representation in fact made. The falsity of all the representations as to the Coke company is established, and they, no less than those with reference to the Connecticut company, are found to have induced the plaintiff to surrender its rights under the first contract and to enter into the second. It is elementary that a plaintiff need not prove all the fraudulent representations he alleges, but may recover if he proves any which in fact served as an inducing cause. *Malley Co.* v. *Button,* 77 Conn. 571, 573, 60 Atl. 125; *Scholfield Gear & Pulley Co.* v. *Scholfield,* 71 Conn. 1, 40 Atl. 1046; *Cross* v. *Bouck,* 175 Cal. 253, 257, 165 Pac. 702; *Long* v. *Davis,* 136 Iowa, 734, 114 N. W. 197; *Wegner* v. *Herkimer,* 167 Mich. 587, 594, 133 N. W. 623; *Somers* v. *Richards,* 46 Vt. 170.

Several incidental claims of error may be briefly disposed of. The trial court did not decide the case upon any issues outside the pleadings; it found express representations to have been made substantially as alleged, and found them to have been false, and either known to the defendant to be false or made in reckless disregard of their truth or falsity. It is true, as already noted, that it also found that the Connecticut company was laboring at the time under certain financial difficulties, which were designedly exaggerated by

the defendant; but the truth or falsity of the representations are to be judged in the light of the meaning which the plaintiff would reasonably attach to them in the existing circumstances. *Johnson* v. *Hathorn*, 2 Abb. Ct. App. Dec. (N. Y.) 465, 468, quoted in *Nellis* v. *Western Life Ind. Co.*, 207 N. Y. 320, 333, 100 N. E. 1119; *Mauger* v. *Slavin*, 42 N. Y. Supp. 331, 332; *Smith* v. *Chadwick*, L. R. 9 App. Cas. 187, 201. The finding falls far short of saying that the representation as to the company being in serious financial difficulties was substantially true, in the sense in which the plaintiff was entitled to understand it. The trial court does not find that any of the representations were made in a belief of their truth, and such a finding could be imported into the record only by our accepting the testimony of a witness whom the defendant admits the trial court did not believe. Before the plaintiff began the present action, it had already commenced one against the Coke company for breach of its contract of purchase, which was still pending, and the defendant claims that such a course is inconsistent with its pursuing its present claim; but distinct causes of action against different defendants often grow out of one transaction. *Douglass* v. *Galwey*, 76 Conn. 683, 58 Atl. 2. At the date of the commencement of this action, the plaintiff had no knowledge of the falsity of the representations made by defendant as to the Coke company. At no time after the commencement of plaintiff's action for breach of contract did the Coke company have any substantial assets out of which any judgment could have been satisfied. There is no inconsistency in the plaintiff's positions in the two actions, for its very claim to recover damages at law implies an affirmation of the contract; *Bitondi* v. *Sheketoff*, 91 Conn. 123, 99 Atl. 505; *New York Land Imp. Co.* v. *Chapman*, 118 N. Y. 288, 295, 23 N. E.

187; *Merry Realty Co.* v. *Shamokin & Hollis Real Estate Co.,* 230 N. Y. 316, 321, 130 N. E. 306; *Krumm* v. *Beach,* 96 N. Y. 398, 406; *Rochester Bridge Co.* v. *McNeill,* 188 Ind. 432, 122 N. E. 662. Nor is there danger of injustice to the defendant in such a ruling, because if his claim against the Coke company had any value, it would have to be deducted from the damages otherwise recoverable. *Whittier* v. *Collins,* 15 R. I. 90, 91, 23 Atl. 47; *Baker* v. *Ashe,* 80 Tex. 356, 360, 16 S. W. 36. Nor, at least as regards its right of action, does it matter whether the failure of the Coke company to give security for further deliveries would under its contract merely give the plaintiff the option itself to cease performance or entitle it to damages for breach of the contract, for confronted with the failure of the corporation to pay for the coal it had received and to give security for payment for future deliveries, the plaintiff was amply justified in refusing to proceed; and if, in contemplation of law, loss came at all to it by reason of its having been induced to make this contract, it would follow in one case as surely as in the other.

That brings us to the matter of damages. The trial court does not in terms state the basis upon which damages were assessed, as it ought to have done; *Gustafson* v. *Rustemeyer,* 70 Conn. 125, 39 Atl. 104; but a comparison of the principal sum awarded with the figures given in the finding with reference to the contract with the Coke company, makes it probable, as the defendant claims, that the court awarded to the plaintiff the difference between the contract price and the market price of the coal called for in the Coke contract but not delivered, with interest.

Both the Connecticut company and the New York company contracts were made in New York and the fraudulent representations, found proven, were also

made in New York. "A tort committed in one State creates a right of action that may be sued upon in another unless public policy forbids." *Loucks* v. *Standard Oil Co.,* 224 N. Y. 99, 106, 120 N. E. 198. The right of action, its nature, validity, and construction, under the generally accepted rule, are to be determined by the *locus delicti,* but matters of procedure affecting an action of this character are to be determined by the *lex fori.* This does not go far to help us solve our problem,—whether the measure of damages in an action of fraud committed in New York is determined by the *locus delicti,* New York, or the *lex fori,* Connecticut. The breach of either of these contracts would have created a right of action for the damages suffered by the breach, since the right of action was property. The damages recoverable must be the equivalent of the right destroyed. The existence and nature of the right are inseparable from the extent of the destruction. The extent of the damage is created at the very instant of the right of action for the breach. It is not a matter of mere procedure but equal in creation to the right. If we seek for a difference in principle between the action for breach of contract and that for tort, where each arises in a jurisdiction other than where suit is brought, bringing the recovery for the breach of the one within the measure of damages of the place of the breach, and for the injury of the other within the measure of damages of the place of the injury, our search will be in vain. The difference does not exist. Nor should it. The right of action for the injury is inseparable from its extent, hence the measure of damages as well as the right of recovery are determined by the place of the injury. The extent of the damage is created at the very instant of the right of action for the injury. When our courts support an action created in another jurisdiction, we

do not enforce the foreign law, we enforce the obligation incurred, or the right of action created under it, which "follows the person, and may be enforced wherever the person may be found." *Slater* v. *Mexican Nat. R. Co.,* 194 U. S. 120, 126, 24 Sup. Ct. 581. Such an obligation, or right of action, as a general rule, becomes vested, and will be enforced here precisely as if the obligation or right of action had accrued or arisen in this jurisdiction. The full faith and credit clause of the Constitution requires this.

Certain classes of foreign created actions we refuse to enforce: those which are penal, those which are contrary to the policy of our law, and those for whose enforcement the local judicial procedure is inadequate. These instances are of infrequent occurrence. In an instance such as that before us, we could not consistently refuse to enforce an action for fraud when our law provides for an identical action. We do not stop to consider these exceptions to the general rule, for the case before us does not require it. The source of the obligation incurred, or the liability created, is in the foreign law; plaintiff must pursue its action here and defendant must defend it, as they would in the jurisdiction of its origin, "subject to the conditions and limitations the foreign law creates." Matters of procedure, such as those relating to pleadings, evidence, the course of judicial proceedings, and statutes of limitations, are necessarily governed by the law of the forum. The substantive law of the place where the obligation or liability arose, controls the nature, construction and interpretation of the action, and likewise measures the recovery. This rule, uniformly administered, is definite and certain, and cannot easily be misapplied. The courts of the forum can determine the measure of the recovery provided by the foreign jurisdiction as readily and surely as they can the law

fixing the obligation or liability. We do not find in our decisions a case where we have been called upon to consider an action of tort originating in another jurisdiction and to determine whether the measure of damages shall be that provided by our law, or that provided by the law of the place of the injury. We did assume, in *Howey* v. *New England Navigation Co.*, 83 Conn. 278, 76 Atl. 469, that an action for damages for personal injury in New York could be brought here under our law, and the recovery measured by it; and in *Roe* v. *Jerome,* 18 Conn. 138, 159, we made the same assumption concerning an action for conversion; but in neither case was such a ruling required in the decision of the case. Neither case upon this point furnishes a precedent controlling future decision. We are free to decide the question upon principle and adopt, without the restriction of precedent, the rule which promises the best justice and the greater certainty to litigants in knowing, and to courts in applying, the law.

When one secures, for a breach of his contract made in another jurisdiction, those damages which the place where the contract was made gives, he gets the utmost which he can be entitled to. He never should be entitled to speculate upon the jurisdiction in which to bring his action. So when one, injured in another jurisdiction, secures, in payment for the loss he has suffered, that measure of damage which the place of injury gives, he should not be heard to complain. Whether another jurisdiction gives more or less is of no consequence. The right of action has been determined, and at the very instant of that determination, the law of the jurisdiction establishing the right fixes the extent of recovery. An action of tort arose in Tennessee and an action to recover damages for the tort was brought in Kentucky. The court, in deciding that the law of the place of injury controlled the issue of

liability and the measure of the recovery as well, said: "The law of Tennessee must govern in fixing the liability and the quantum of recovery. It would be strange to apply the law of Tennessee in determining the question of liability, and take the law of the forum to fix the measure of recovery. It would be stranger still for the court to hold that the law of Tennessee should govern in fixing the liability; and then apply the law of Kentucky, which would prevent a recovery, although a recovery is authorized by the law of Tennessee." *Louisville & N. R. Co.* v. *Whitlow's Admr.,* 105 Ky. 1, 7, 43 S. W. 711. The authorities have not been in accord, either in the result reached or in the concept. The tendency is unmistakably toward the rule we adopt. One of the latest cases in the Supreme Court of the United States arose through the negligent failure to deliver in the District of Columbia a message, sent from South Carolina, which prevented one Brown from attending his sister's funeral in South Carolina. The action for damages was brought in South Carolina, where mental anguish was a ground of recovery, while in the District of Columbia it was not. The court held that damages based on the measure of recovery permitted in South Carolina could not be recovered. Mr. Justice Holmes announced the court's final word upon this topic: "Whatever variations of opinion and practice there may have been, it is established as the law of this court that when a person recovers in one jurisdiction for a tort committed in another, he does so on the ground of an obligation incurred at the place of the tort that accompanies the person of the defendant elsewhere, and that is not only the ground but the measure of the maximum recovery." *Western Union Telegraph Co.* v. *Brown,* 234 U. S. 542, 546, 34 Sup. Ct. 955. The court had earlier, through the same justice, expressed

its adherence to the same theory of the law: "The general theory on which an action is maintained upon a cause which accrued in another jurisdiction is that the liability is an *obligatio,* which, having been attached to the person by the law then having that person within its power, will be treated by other countries as accompanying the person when brought before their courts. But, as the source of the obligation is the foreign law, the defendant, generally speaking, is entitled to the benefit of whatever conditions and limitations the foreign law creates." *Davis* v. *Mills,* 194 U. S. 451, 453, 24 Sup. Ct. 692; *Western Union Telegraph Co.* v. *Brown,* 234 U. S. 542, 34 Sup. Ct. 955; *Lauria* v. *Du Pont De Nemours & Co.,* 241 Fed. 687; *Loucks* v. *Standard Oil Co.,* 224 N. Y. 99, 110, 120 N. E. 198; *Louisville & N. R. Co.* v. *Whitlow's Admr.,* 105 Ky. 1, 43 S. W. 711; note, 91 Amer. St. Rep. 726. Writers upon this subject are generally in accord with the position of the United States Supreme Court. 4 Sedgwick on Damages (9th Ed.) § 1373; 1 Sutherland on Damages (4th Ed.) § 7; Article by Justice John K. Beach, Uniform Interstate Enforcement of Vested Rights, 27 Yale Law Journal, 656; 3 Beale's Cases on Conflict of Laws, p. 541.

Having determined that the measure of recovery is that which accrued in New York, where the right of action was then created, we next ascertain the manner in which New York measures the damage. New York holds, as Connecticut does, to the general rule that the damage recoverable in an action of fraud for false representations or other fraud, is the natural and necessary result flowing from the false representations or other fraud. In New York, in the case of the sale of land or breach of contract, these damages will be measured by the difference between the price paid and the value of the property received. *Reno* v. *Bull,*

226 N. Y. 546, 553, 124 N. E. 144. Our own rule differs. We measure the damages by the difference between the actual value of the property and its value had it been as represented, with such additional consequential damages as have resulted from the fraud. *Okoomian* v. *Brandt,* 101 Conn. 427, 126 Atl. 332; *Dwyer* v. *Redmond,* 100 Conn. 393, 124 Atl. 7. Neither rule is adequate to meet the situation in this case. Neither a breach of contract nor of sale is involved, but a case where the fraudulent representations induced the plaintiff to give up its contract with the Connecticut company and substitute in its stead the contract with the Coke company. New York has adopted and applied the rule in such a situation as this, by ascertaining the difference in value between that which the plaintiff parted with, in this case its property interest in the Connecticut company contract, and the value of that which the plaintiff received, in this case the Coke company contract. In *Urtz* v. *New York Central & H. R. R. Co.,* 202 N. Y. 170, 175, 95 N. E. 711, in an action for fraud in procuring the settlement of a claim for $500, the court held that "the question is what was the value of that with which plaintiff parted and what was the value of that which she received"; and *Ochs* v. *Woods,* 221 N. Y. 335, 340, 117 N. E. 305, was an action to recover damages sustained by the plaintiff in inducing the plaintiff to accept another in place of the defendant as his debtor for commissions owed plaintiff for his services in securing a tenant of real estate. The court reiterated its adherence to the rule announced in *Urtz* v. *New York Central & H. R. R. Co., supra,* in this language: "The basic principle underlying all rules for the measurement of damages for deceit is indemnity for the actual loss sustained as the direct result of the wrong. The question is what was the value of that with which plaintiff parted and

what was the value of that which he received." See also *Reno* v. *Bull,* 226 N. Y. 546, 553, 124 N. E. 144.

When the contract with the Connecticut company was executed, the plaintiff secured a vested interest in the contract, which was property, for the breach of which it was entitled to the value of its property right in the contract. This right of property, measured by the value to the plaintiff of its profit of seventy-five cents a ton, was worth, as the defendant in his brief concedes, $27,822.67, provided the contract was carried out. When the plaintiff surrendered this contract and accepted in its stead the Coke company contract, it surrendered property of the value of $27,822.67, since the Connecticut company is found to have then been financially responsible. When plaintiff accepted the Coke company contract, it obtained likewise a property right in this contract to the extent of its value. The Coke company, or its nominee, accepted and paid for a part of the 60,000 tons of coal which it contracted to buy of plaintiff upon which plaintiff made a profit of $1,892.17. The balance, 47,385.50 tons, the Coke company refused to accept; plaintiff, through its contract with the Mayer Brick Company, made for the purpose of filling its contract with the Coke company, became liable to the Mayer Company for the difference between the contract and market price at the place of delivery upon this 47,385.50 tons. It has taken from the Mayer Brick Company and paid for, 20,166.25 tons, and disposed of these without loss. It is still obligated to the Mayer Brick Company for 27,219.25 tons of the 60,000-ton contract of April 21st, 1921; so that the total of its obligation, paid and unpaid, for the balance of its contract with the Mayer Brick Company, was $53,184.78, which represents the loss to it from the Coke company contract less the $1,892.17 profit on the 12,614.50 tons accepted by the

Coke company, or $51,292.61. If the defendant knew or ought reasonably to have contemplated, and the statement of facts so shows, that the plaintiff, in carrying out its contract with the Coke company, must purchase the coal so contracted for, any expenditures which the plaintiff made, or became obligated to make by reason of that purchase, would also be recoverable as a part of its loss, not exceeding the Coke company contract price, and subject to a deduction of such sums as, acting reasonably, it has or ought to have realized under it. *Wood* v. *Dudley,* 176 N. Y. Supp. 494, 501. The New York rule is identical in this particular with our rule as stated in *Gustafson* v. *Rustemeyer,* 70 Conn. 125, 135, 39 Atl. 104, that a defendant is liable for those losses which may be presumed to have been within his contemplation at the time, as a man of average intelligence. The defendant's contention that the claim of the plaintiff under the Connecticut company contract was practically uncollectible, and its claim under the Coke company contract was of substantial value, are based, not upon the condition of these companies as the court found it to be, but upon their condition as he asks us to find it, and since the finding must stand, the contention falls. The loss on the Connecticut company contract was $27,872.67, and on the Coke company contract $51,292.61, or a total loss to plaintiff of $79,115.28, with interest, which is more than the judgment; hence defendant has no ground of appeal upon the·damages awarded.

There is no error.

In this opinion the other judges concurred.