**John C. SCHIRM III, Plaintiff,**

v.

**Randolph AUCLAIR, Co-executor of the Estate of John P. Kinsey, and Jack Bair, Co-executor of the Estate of John P. Kinsey, Defendants.**

**Civ. A. No. N–83–341 (RCZ).**

United States District Court, D. Connecticut.

Oct. 26, 1984.

Hugh I. Manke, Reif & Manke, P.C., New Haven, Conn., Pat E. Morgenstern-Clarren, Cleveland, Ohio, for plaintiff.

Robert I. Teicher, Gager, Henry & Narkis, Waterbury, Conn., for defendants.

RULING ON MOTION TO DISMISS

ZAMPANO, Senior District Judge.

## I. FACTS

Plaintiff John C. Schirm III is the former president of Youngstown Container Corp. ("Youngstown"), an Ohio corporation. The defendants Randolph Auclair and Jack Bair are co-executors of the estate of John P. Kinsey, who was the principal shareholder of Youngstown. The present dispute concerns three cognovit promissory notes made by Youngstown in 1973 and 1974 pursuant to renegotiated loans, signed by plaintiff Schirm in his representative capacity. The original principal amount of the notes totaled $202,464.21. The notes named Northern Ohio Bank ("Bank") as payee, and were secured by Youngstown's inventory, equipment, and receivables. Although Schirm signed these notes as president of Youngstown, he was also personally liable on them as co-maker under an "Agreement to be Bound" for Youngstown's debts that Schirm and the Bank entered into in 1971.

Sometime before his death in 1977, Kinsey allegedly removed to Connecticut certain unspecified Youngstown assets that secured the three notes.[1] Within a few months after Kinsey died on July 15, 1977,

Youngstown defaulted on the three notes. In the meantime, the Bank had been placed into receivership by state authorities in 1975, and the Federal Deposit Insurance Corporation ("FDIC") was assigned the three notes in 1978. In 1978, the FDIC sued Youngstown and Schirm on the notes in an Ohio state court, and, pursuant to the notes' cognovit clauses, judgment for the outstanding amount of the notes, $138,920.54 plus interest, was entered against Youngstown and Schirm jointly and severally. The judgment was vacated on May 24, 1978, but was reinstated on July 14, 1978, by agreement of Schirm and the FDIC. In that agreement the FDIC agreed first to attempt to recover the amount of the judgment from the estate of Kinsey, before attempting to recover from Schirm any deficiency.

The FDIC filed an action against Kinsey's estate in United States District Court in Hartford in 1978 to recover the collateral that Kinsey allegedly removed from Ohio, or for $150,000 in damages. *FDIC v. Auclair*, Civil No. H–78–464 (D.Conn. filed Sept. 11, 1978). The estate, through Auclair and Bair, settled that litigation for $80,000 on November 13, 1981. The Kinsey estate then sold the collateral, and the proceeds of $39,459.26 were applied toward the estate's settlement of the action. The FDIC then sought to recover the deficiency from Schirm, and on September 24, 1982, Schirm agreed to pay the FDIC $50,000 plus interest in settlement of FDIC's claim against him.[2] On January 23, 1983, Schirm presented a claim to Kinsey's estate for the $50,000 he agreed to pay the FDIC. The claim was denied by the defendants on February 23, 1983.

In this action, plaintiff in the complaint's three counts (1) seeks a declaratory judgment that the estate owes him $50,000, alleging that an indemnity agreement was

---

1. In a suit in connection with this matter filed by the FDIC in United States District Court in Connecticut in 1978, the FDIC alleged that Kinsey removed the assets to Connecticut in 1975. *See FDIC v. Auclair*, Civil No. H–78–464, complaint at ¶ 16 (D.Conn. filed Sept. 11, 1978).

2. Under his agreement with the FDIC, Schirm was to pay $20,000 at the time he accepted the FDIC's settlement offer, and $1,454.60 monthly for 24 months. Under the terms of the agreement Schirm will have fully paid in October 1984.

breached; (2) claims that plaintiff relied to his detriment on an agreement between Kinsey and plaintiff that plaintiff was not to be bound personally on the notes; and (3) alleges that Kinsey converted the collateral, in which plaintiff claims he had rights, when he brought it to Connecticut.[3] Defendants have moved under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint. As to the first two counts, defendants contend that the Connecticut nonclaim statute, Gen.Stat. § 45–205, bars this action. As to the third count, they argue that it is time-barred under Conn.Gen.Stat. § 52–577, which requires that actions for intentional torts, including conversion, be filed within a three-year limitations period. Further, they state as to count three that Schirm had no possessory right to the collateral in question, therefore it could not have been converted as to Schirm by Kinsey.

## II. CHOICE OF LAW ISSUES

■ In this diversity action, the Court must apply the substantive law of Connecticut, including Connecticut's conflict of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Brown v. Merrow Machine Co.*, 411 F.Supp. 1162, 1163–64 (D.Conn.1976). Connecticut follows the "traditional" choice of law rules, so that in contract actions the law of the place of contracting governs substantive issues, *Graham v. Wilkins*, 145 Conn. 34, 39–40, 138 A.2d 705, 708 (1958), and in tort actions the law of the place of the injury governs substantive issues. *Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977).

■ Although plaintiff labels count two as a tort action, it is evident to the Court that plaintiff's first two counts are pure contract causes of action. Since both contracts at issue—an agreement under the law of suretyship to indemnify plaintiff and Kinsey's separate agreement to hold plaintiff harmless—were entered into in Ohio, the law of that state must govern certain substantive questions to be resolved in rul-

ing on defendants' motion to dismiss under the Connecticut nonclaim statute. Plaintiff's amended count three and his materials responding to the motion to dismiss refer to two allegedly tortious acts by different actors: the conversion of Youngstown's assets by Kinsey in Ohio prior to 1977, and the estate's failure to act in a commercially reasonable manner when it sold estate assets, presumably in Connecticut, sometime between November 13, 1981, and September 24, 1982, in order to satisfy the FDIC lawsuit pending against it. Because plaintiff's brief in opposition to the pending motion refers nearly exclusively to acts in Ohio as the basis of liability for count three, Ohio law governs whether plaintiff may maintain an action for conversion.

## III. DISCUSSION

The Connecticut nonclaim statute, Gen. Stat. § 45–205(a), provides that a creditor must present his claim against the estate before the time limit set by the probate court, within the statutory limits of three to twelve months from the date of the probate court's order, or be barred from presenting the claim later.

The purposes of the nonclaim statute were recently repeated by the state Supreme Court in *Breen v. Phelps*, 186 Conn. 86, 439 A.2d 1066 (1982). The statute is designed to "inform an administrator or executor of what claims may have to be paid out of the estate [citations omitted]; and thereby to permit the speedy settlement of estates." *Id.* at 101, 439 A.2d at 1076.

However, not all claims must be presented within the general period required by § 45–205(a), because actual claims may not exist during that time. Section 45–205(b) governs claims against the estate that were contingent while the estate was open. That section provides in pertinent part:

> when a right of action [against an estate] accrues after the time limited for the

---

**3.** In addition, plaintiff contends in count three that the estate failed to sell those assets in a

commercially reasonable manner in satisfying the settlement of the 1978 judgment.

presentation of claims, it shall be exhibited within four months after such right of action accrues and shall be paid out of the estate remaining after the payment of the debts exhibited within the time limited.

Gen.Stat. § 45–205(b). The rationale of § 45–205(b) is that when the liability of the estate "depends on some future uncertain event the claim is contingent and its presentation would not 'hasten the final settlement of the estate, or in any way advance the interests of those who are to enjoy the estate.'" *Breen*, 186 Conn. at 103, 439 A.2d at 1077 (quoting *Bacon v. Thorp*, 27 Conn. 251, 260 (1858)).

For the purpose of determining whether a claim is contingent under the nonclaim statute, Connecticut courts quite logically equate the word "claim" in § 45–205(b) with the term "cause of action." Indeed, § 45–205(b) specifically provides that a claimant has four months after "a right of action accrues" in which to present the claim. In *Ryder v. Hertz Corporation*, 29 Conn.Sup. 9, 269 A.2d 32 (1970), the lessor of an automobile (Hertz) was sued by individuals who were injured while its automobile was being driven by a lessee who died before the injured parties instituted their lawsuit against Hertz. Hertz impleaded the estate of the lessee, but the estate argued that the lessor failed to present its claim in a timely manner under § 45–205(a). The court rejected the estate's argument, determining that Hertz' claim for indemnity was not barred by the statutory period of § 45–205(a). The court noted that "[a] right of action does not attach until the cause of action comes into being." *Id.* at 12, 269 A.2d 32. The court held that Hertz' claim was contingent while the estate was open:

> It is clear that within the period designated by the Probate Court for the presentation of claims no litigation had been instituted against Hertz by the (injured plaintiffs). While, by virtue of its ownership of the leased vehicle at the time of the accident and within that period, there did exist potential liability on the part of Hertz upon the commencing of a suit ...

and, in that event, the further possibility of an assertion of a claim by the Hertz against the executor, the possibility of the occurrence of these events did not invest Hertz with a 'claim' within the meaning of the statute.

*Id.* at 11, 269 A.2d 32.

Other states follow the same approach, holding that a person does not have a "claim" against an estate until he has a "cause of action" against it. *See Turner v. Meek*, 225 Ark. 744, 284 S.W.2d 848, 850 (1955) (distinguishing feature of contingent claim is that a cause of action has not accrued); *In re Shaw's Estate*, 340 So.2d 491, 492 (Fla.App.1976) (claim contingent when liability of estate depends on future event which may or may not happen, and which makes it wholly uncertain whether there will ever be liability); *National Bank of Detroit v. Voigt's Estate*, 357 Mich. 647, 99 N.W.2d 504, 507 (1959) (contingent claim is one which does not exist but which may possibly hereafter arise); *Helliker v. Bram*, 277 S.W.2d 556, 561 (Mo.1955) (distinguishing feature of contingent claim is that cause of action has not yet accrued).

Under this approach, the Court must determine when plaintiff's various claims first arose, under Ohio law, in order to apply the Connecticut nonclaim statute.

### 1. *Count One*

Although the complaint in count one does not state explicitly on what legal theory plaintiff is basing his cause of action, the parties have briefed the question as one of indemnification. Therefore, the initial issue to be decided is at what point in time plaintiff first could claim that he had a right to indemnification.

Resolution of this question requires an application of the law of suretyship. Plaintiff Schirm agreed by contract to be primarily liable for Youngstown's debts, therefore he was Youngstown's surety. Plaintiff alleges that because Kinsey did not respect corporate formalities, Kinsey was personally responsible for the liabilities of Youngstown. Therefore, plaintiff

contends that he has the same surety rights against Kinsey's estate as he had against Youngstown.

As in any surety situation, this case involves three basic contracts: first, the obligation between the debtor (Youngstown and Kinsey) and the creditor (Northern Ohio Bank and the FDIC) based on the debt; second, the surety's promise to the creditor to back up the underlying obligation of the debtor (plaintiff's 1971 "Agreement to be Bound"); and third, the promise of the debtor to reimburse the surety if the surety is required to pay the creditor based on the second contract. The Court must assume for the purposes of this motion that plaintiff will be able to show that there was such an agreement between plaintiff and the debtor, either express, implied or created by operation of law.

A surety generally has the right of reimbursement when he pays the debt of another. Under the common law and Ohio case law, until the surety actually pays all or part of the debt, he may not bring an action for indemnification against the debtor. *Maryland Casualty Co. v. Gough,* 146 Ohio St. 305, 65 N.E.2d 858, 865 (1946); *Henderson-Achert Lithographic Co. v. John Shillito Co.,* 64 Ohio St. 236, 60 N.E. 295, 299 (1899); *Barger v. Gething,* 39 O.L.A. 221, 42 O.L.A. 485, 52 N.E.2d 94, 95 (1943).[4] *See also Wicker v. Hoppock,* 6 Wall. 94, 73 U.S. 94, 99, 18 L.Ed. 752 (1867) (surety cannot recover under indemnification contract "until he is actually damnified"); *Bishoff v. Fehl,* 345 Pa. 539, 543, 29 A.2d 58, 59–60 (1942); *Savings Bank of Manchester v. Kane,* 35 Conn.Sup. 82, 84, 396 A.2d 952 (C.P.1978). *Cf. American Oil Co. v. Valenti,* 179 Conn. 349, 394, 426 A.2d 305, 308 (1979) (right of indemnification a separate cause of action for purposes of statute of limitation); *Republic-Franklin Ins. Co. v. Progressive Casualty Ins. Co.,* 45 Ohio St.2d 93, 341 N.E.2d 600, 602 (1976) (surety who actually pays has right to reimbursement). As Stearns notes in *Law of Suretyship* (J. Elder 5th ed. 1951):

[A] cause of action against the principal does not arise until the promisor [surety] makes payment of the debt. It is not necessary for the surety to pay the entire debt. An indemnity may be enforced upon part payment to the extent of the amount paid, and, if the debt is paid by installments, action may be brought for each installment as it is paid.

*Id.* § 11.37, at 514. *See also* Restatement of Security § 104(1).

Two courts have expressly determined, in cases sufficiently similar to this case to be helpful, that a surety's claim for indemnification against a debtor was merely a "contingent claim" before the surety actually paid the creditor. In *Keifer v. Kissell,* 83 Ohio App. 133, 75 N.E.2d 692 (1947), the plaintiff estate of an individual paid the amount due on a note on which the individual was a surety for the debtor defendant. The claim for indemnity was presented to the debtor's estate the day after the surety's estate paid the creditor, but eight months after the estate was closed. The court held that the surety's claim for indemnification before he actually paid the debt was contingent, and allowed the claim. The court reasoned, "[n]o cause of action accrued to the plaintiff until payment was made by the [plaintiff surety's] estate." *Id.* at 694.

*Curley v. Hand's Estate,* 53 Vt. 524 (1881), involved interpretation of a statute that expressly provided for presentation of contingent claims after estates were closed. The statute is not identical to the Connecticut statute, but the court's definition of "contingent claim" is enlightening.

In *Curley* an individual made a note payable to the plaintiff, and the plaintiff endorsed the note to Bellows, thereby becoming secondarily liable on the note. The maker and Bellows then died, but Bellows' estate did not present the note to the maker's estate. The plaintiff endorser appar-

---

**4.** Ohio law makes an exception to this rule in certain circumstances not relevant here. *See* Ohio Rev.Code Ann. § 1341.20 (Page 1979).

ently paid the note's holder, Bellow's estate, and he submitted a claim for indemnity against the maker's estate. He asked that his liability as an endorser be considered contingent so as to allow consideration of the claim although the estate was closed. The court determined that the plaintiff had a contingent claim that could be presented:

> An indorser stands in substantially the same relation to the debt [of a decedent] as a surety so far as concerns the element of contingency. He is liable to the holder, yet has no absolute claim against the estate of the maker until he pays the note. His claim is contingent upon the enforcement of the note against him. Therefore it is plainly within the spirit and the just object of the statute, and within the definition of a contingent claim as given in *Sargent's Adm'r v. Kimball's Adm'r*, 37 Vt. 320, [where it is said], "A contingent claim is where the liability depends upon some future event which may or may not happen, and therefore makes it wholly uncertain whether there ever will be a liability."

*Id.* at 525–26. The court explained that "the future event on which the liability depends would be enforcement of the note against the [surety], which may or may not happen. If it does, the indorser should be reimbursed out of the estate." *Id.* at 526. The court added that the "principal owes nothing to the surety until the latter has paid the debt. The liability to the surety is contingent upon payment by him." *Id.* at 525. For a nearly identical case under the

Connecticut nonclaim statute, see *Meriden Steam Mill Lumber Co. v. Guy*, 40 Conn. 163, 168–69 (1873) (cause of action against maker of note accrued to endorser upon actual payment of note to holder, and action not barred by nonclaim statute).

■ Applying these principles of suretyship law to the Connecticut nonclaim statute, plaintiff's claim was timely presented. Plaintiff's claim for indemnification against the estate was not only "contingent" prior to September 1982, it was nonexistent.[5] A claim on a right to reimbursement could not have been brought before that date. Before plaintiff could ask the estate to be *reimbursed,* he must have *disbursed* some amount, and the fact that plaintiff had a judgment against him in 1978 is not a disbursement that would have given him a right of indemnification.

Moreover, application of the nonclaim statute in a situation involving the potential liability of a debtor's estate for indemnity on a surety contract would not further the statute's aims, which are "to inform an administrator or executor of what claims may have to be paid out of an estate [citations omitted]; and thereby to permit the speedy settlement of an estate." *Breen,* 186 Conn. at 101, 439 A.2d at 1076. Before plaintiff paid the creditor in 1982, the estate's potential liability in an action for indemnification might have been as little as nothing, or as high as $138,920.54. If plaintiff had submitted a claim encompassing that range before 1982, a "speedy reso-

---

5. Plaintiff did not have a right of indemnification until September 1982, but he may have had the statutory and equitable right under Ohio law to compel the debtor to pay the debt when it became due. *See Williamson v. Rubich,* 79 O.L.A. 405, 156 N.E.2d 138, 140 (1957); Ohio Rev.Code Ann. § 1341.19 (Page 1979). This is the familiar common law right of exoneration. *See* Restatement of Security § 112. Sureties, however, have rights to both indemnification and exoneration; they are by no means exclusive.

Defendants' reliance on *Roth v. Ravich,* 111 Conn. 649, 151 A. 179 (1930) in support of their argument that plaintiff's indemnification claim was not contingent after the 1978 action brought by the FDIC was resolved, is misplaced. The court in *Roth* determined that a note for a sum certain due on a particular date was an existing

claim, rather than a contingent claim, against the estate of the maker's successors. The court determined that unmatured debts were "existing obligations and capable of proof." *Id.* at 652, 151 A. at 180.

Plaintiff Schirm's claim for indemnification was not an existing obligation and was not capable of proof before he actually paid the FDIC pursuant to his surety contract. Therefore plaintiff's claim was not an "unmatured debt" within the ambit of *Roth.* Defendants are incorrect when they contend that because plaintiff was primarily liable to the debtor following the 1978 judgment, "the liability of Kinsey's estate to Schirm also became certain on that date." From April 1978 until September 1982, there was no more than a possibility that Schirm would actually pay the FDIC pursuant to the surety contract.

lution" of the estate would have been impossible, because the claim was not "sufficiently definite and appreciable to be capable of a just adjudication." *Bacon*, 27 Conn. at 260. As the Connecticut Supreme Court noted in *Breen*, permitting this action might require redistribution of the estate, but "[t]he distribution of an estate would not be an insurmountable barrier to a recovery on an after-accruing claim." 186 Conn. at 104, 439 A.2d at 1077.

Plaintiff's claim for indemnification arose on September 22, 1982, and it was timely presented to the estate within four months pursuant to § 45–205(b). Defendants' motion to dismiss count one must be denied.

## 2. *Count Two*

In count two plaintiff alleges that Kinsey agreed in 1973 or 1974 to hold plaintiff harmless for any personal liability that plaintiff might incur on the notes, and that plaintiff "relied to his detriment on Kinsey's representation...." Plaintiff refers to this count as based on a tort cause of action, perhaps to take advantage of the tort exception to the nonclaim statute, § 45–205(f). However count two in fact sets forth a contract cause of action. It seems clear that plaintiff is relying on the "promissory estoppel" or "detrimental reliance" theories of contract formation. *See* Restatement (Second) of Contracts § 90 & comment b. Insofar as plaintiff is alleging an action for breach of contract, it must be determined when the cause of action, if any, arose. ·

■ Although Kinsey's alleged promise was made nearly ten years before plaintiff's claim on the estate, a breach of contract action may not be maintained on the promise alone. Rather, there must be a breach of the contract before an action will

lie. In this case, it could be determined that the estate breached the contract between Kinsey and plaintiff on February 23, 1983, when defendants disallowed plaintiff's claim. Until plaintiff was refused the benefit of his purported agreement with Kinsey, he could not have maintained a breach of contract action. Therefore count two also is not barred by the Connecticut nonclaim statute, § 45–205(b).

## 3. *Count Three*

The basis of count three appears to be plaintiff's contention that Kinsey wrongfully converted, or "took dominion and control over Youngstown's assets," sometime before 1977. Those assets, of course, were the security for the three notes. Plaintiff claims that he had a "superior property right with respect to said collateral since he personally guaranteed the payment of said loans,"[6] therefore he should be able to maintain a conversion action. The issue the Court must consider is what rights, if any, plaintiff as a surety had in the debtor Youngstown's assets before he paid part of the debt.

■ All parties agree that under Ohio law the plaintiff in a conversion action must show that he had the right to present possession of the property in question. *See General Motors Acceptance Corp. v. Birkett L. Williams Co.*, 17 Ohio Misc. 219, 243 N.E.2d 882, 891 (1969). Plaintiff contends he had the right of possession on September 24, 1982, when he paid the creditor FDIC and was subrogated to the creditor's rights against the collateral.[7]

■ As discussed above, plaintiff must be considered a surety. The 1971 "Agreement to be Bound" did not expressly give plaintiff rights in Youngstown's assets. If plaintiff ever had any rights to the collater-

---

**6.** It should be noted, for the sake of consistency, that plaintiff did not "guarantee" payment of the notes; he was primarily liable on the notes, therefore he was a surety.

**7.** Plaintiff claims that even if the property was converted before 1977, which would seem to prevent a conversion action due to the three-year statute of limitation for torts, Gen.Stat. § 52–577, conversion is a "continuing course of conduct" that tolls operation of the statute. The Court does not need to consider that argument in order to rule on this motion.

al, his rights were those of a common law surety.

If a surety pays part or all of a debt to a creditor, the surety is subrogated to the creditor's rights in any collateral that secures the debt. *See* Stearns, *supra*, § 11.4. In this case, at the time plaintiff claims he was subrogated to the creditor's interest in the collateral, the creditor had no interest in it whatsoever. Apparently the creditor had previously consented to a sale of all of the collateral between November 13, 1981, and September 24, 1982, in order to help pay off the debt.

Plaintiff alleges that the sale of the collateral by the estate was "commercially unreasonable." If that is so, his claim that the collateral was impaired should have been against the creditor to be released from his suretyship. *Id.* § 6.49. Plaintiff has no tort remedy or subrogation remedy against the debtor under suretyship law on the facts that he has alleged. Plaintiff's amended count three, therefore, must be dismissed.

## IV. ORDER

Defendants' motion to dismiss counts one and two of the complaint is DENIED. Defendants' motion to dismiss count three of the complaint as amended is GRANTED.