EMHART INDUSTRIES, INC., Plaintiff,

v.

DURACELL INTERNATIONAL INC.,
and Dart Industries, Inc.,
Defendants.

DURACELL INTERNATIONAL
INC., Plaintiff,

v.

EMHART INDUSTRIES,
INC., Defendant.

Nos. 1–85–0055, 1–85–0088.

United States District Court,
M.D. Tennessee,
Columbia Division.

July 2, 1987.

John L. Chambers, Chambers Wyckoff & Beckner, Nashville, Tenn., for plaintiff in 1–85–0055.

Leonard Rivkin, Stanley Pierce, Joseph Ortego, Michael R. Adams, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., M. Clark Spoden, Dearborn & Ewing, Nashville, Tenn., for defendants in 1–85–0055.

Warren S. Radler, Rivkin, Radler, Dunne & Bayh, Chicago, Ill., for Emhart.

James D. Miller, King & Spalding, Washington, D.C., for plaintiff in 1–85–0088.

Raymond L. Falls, Jr., David R. Hyde, Eric Hellerman, Cahill, Gordon & Reindel, New York City, for defendant in 1–85–0088.

### MEMORANDUM

WISEMAN, Chief Judge.

This is a breach of contract case that involves the sale of the Mallory Components Group by Duracell International Inc. (Duracell) to Emhart Industries, Inc. (Emhart). Some of the facilities transferred in the sale are contaminated with toxic substances: polychlorinated biphenyls (PCBs) and trichloroethylene (TCE). Both the policies of contract law—the law of private ordering—and the policies of environmental law—the protection of the public and of natural resources—are at issue. The Court ordered the trial of this case bifurcated into separate liability and damages trials to the Court. For the reasons that follow the Court holds that Duracell and Dart are liable to Emhart for the cost of clean-up of the facilities and equipment transferred in the sale, for the consequential damages measured by the time necessary to effect a clean-up, for the costs attendant to enforcing the contract, and for some portion of the costs of the third party actions. The Court also holds that Duracell is liable to Emhart for CERCLA response costs.

### I. Procedural Background

The case before the Court is actually two consolidated actions. *Emhart Industries, Inc. v. Duracell International Inc. and Dart Industries, Inc.* was filed in the United States District Court for the District of Connecticut. That action seeks damages for breach of contract, fraud, negligent misrepresentation, nuisance, violation of the Connecticut Unfair Trade Practices Act (CUTPA),[1] and violation of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA);[2] it also seeks a declaratory judgment under CERCLA and the sales contract. *Duracell, Inc. v. Emhart Industries, Inc.* was filed in the United States District Court for the Middle District of Tennessee. It seeks a declaratory judgment under the Toxic Substances Control Act (TSCA)[3] and regulations related to TSCA.[4]

By agreement of the parties the Connecticut action was transferred to Tennessee.[5] The two actions were then consolidated by the Court. No party requested a jury and in the interests of judicial economy the Court bifurcated the case. Fed.R.Civ.P. 42(b). The liability phase of the trial began on December 15, 1986. The stipulated questions submitted to the Court were

(a) whether Duracell or Dart or both of them are liable to Emhart on Counts I to VII, inclusive, of Emhart's Complaint and

---

1. Conn.Gen.Stat. § 42–110a et seq.

2. 42 U.S.C. § 9601 et seq.

3. 15 U.S.C. § 2601 et seq.

4. 40 CFR §§ 761.1 et seq.

5. *See* § IIIA, Conflict of Laws, *infra.*

whether the affirmative defenses asserted by Dart or Duracell have merit including any related to the use of trichloroethylene;

(b) whether Emhart is entitled to the declaratory judgment Emhart prays for on page 42 of its complaint [CERCLA and breach of contract]; and

(c) whether Duracell or Dart or both of them are entitled to the declaratory judgment prayed for in their complaint [TSCA].[6]

The amount, basis, and method of calculation of Emhart's damages including consistency with the National Contingency Plan[7] under CERCLA and including the quantum exacerbation by the use of TCE were reserved for the damages trial.

## II. Findings of Fact

### A. Parties

The parties to this lawsuit are large corporations. Emhart is a Connecticut corporation with its principal place of business in Farmington, Connecticut. Emhart manufactures and distributes a wide variety of products throughout the world.

Dart is a Delaware corporation with its principal place of business in Northbrook, Illinois. Dart manufactures and sells consumer and specialty products. Duracell is a wholly-owned subsidiary of Dart.[8]

Duracell is the current name of a company that Dart acquired in late 1978 and early 1979: P.R. Mallory & Co. Inc. P.R. Mallory was an electronics company that made batteries and electrical components.[9] In July 1979 Emhart bought the P.R. Mallory facilities that made components: Mallory Capacitor Company, Mallory Timers Company and Mallory Control Company. Together these companies were known as the Mallory Components Group. In February 1980 the remaining part of P.R. Mallory adopted the name Duracell.[10]

### B. The Sale

In July, 1979, Duracell and Emhart reached an agreement in principle for the sale of the Mallory Components Group. Among the assets to be acquired were three manufacturing plants and a headquarters complex. The three plants were located at Waynesboro, Tennessee; Glasgow, Kentucky; and Greencastle, Indiana. The headquarters complex was in Indianapolis, Indiana. During the negotiations Emhart learned that PCBs had been used in the manufacture of capacitors[11] at

---

**6.** Statement of Issues to be Tried and Witnesses to be Called at Liability Phase of Bifurcated Trial as well as Statement of Issues not to be Decided Until the Damage Trial, at 2. Count 1 of Emhart's complaint seeks to recover CERCLA response costs; Count 2 alleges common-law fraud; Count 3 alleges negligent misrepresentation; Count 4 alleges common-law nuisance; Count 5 alleges breach of contract by Duracell; Count 6 alleges breach of contract by Dart; Count 7 alleges violation of CUTPA. The affirmative defenses, other than Fed.R.Civ.P. 8(a)(2), 8(e)(1) and 9(b) are laches and waiver. They include the issue of any TCE contamination caused by Emhart that might bar liability. As Duracell and Dart acknowledged in their proposed findings of fact and conclusions of law, the TSCA declaratory judgment is fully subsumed in the transferred action and requires no separate resolution.

**7.** In CERCLA the president is directed to create a national contingency plan including a "national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants ... [and] shall specify procedures, techniques, materials, equipment and methods to be employed in identify-ing, removing or remedying releases of hazardous substances." 42 U.S.C. § 9605 (as amended Oct. 17, 1986). Consistency with the National Contingency Plan is required for response costs to be recoverable. 42 U.S.C. § 9607(a).

**8.** Unless context and clarity clearly require it, the Court will not distinguish between the actions of Dart and of Duracell in this litigation. "Duracell" will be used to refer to both companies.

**9.** Dart, at the time of its unsolicited cash tender offer, announced its intention to dispose of all but the battery division.

**10.** The Court will use the name Duracell for both before and after February 1980.

**11.** Capacitors are devices which store electrical energy; they are used in products ranging from computers to window air conditioners. Several different types of capacitors exist. Electrostatic AC capacitors were made at Waynesboro using a paper-oil method. These capacitors were impregnated with a PCB-containing oil until 1978. PCBs are very stable, nonflammable liquids which are highly resistant to electrical currents.

Waynesboro.[12] Emhart also learned during the negotiations that Duracell was storing PCBs in drums in a building at Waynesboro, and in an underground storage tank there. This tank leaked. PCBs were also discovered in the former boiler room in a subbasement area that was subject to ground water flooding. The parties have stipulated that the use of PCBs before Emhart purchased the plant led to PCB contamination on the floor, roof and ground. Emhart insisted on some contractual protections from liability for PCBs. Emhart also required as a condition precedent to the sale a guarantee of Duracell's promises by Dart.

Emhart drafted the PCB provisions of the purchase agreement. Gregg Dwyer, an officer of Duracell and an attorney licensed to practice law in Indiana, acted as principal attorney for Duracell in the sales negotiations. Mr. Dwyer testified that he had attempted to negotiate some changes in the PCB provisions of the purchase agreement: "I argued for a change to the PCB provisions in the agreement with Emhart's lawyers." T. 553:20–21. He also testified that part of Duracell's reason for accepting the terms was that the agreement "while less than desirable, could be lived with," T. 556:3, and that he saw the deal as remaining advantageous despite the liabilities Duracell and Dart were assuming. T. 556:9–14.

The Purchase Agreement contains numerous provisions concerning PCBs. On page 2, in section 3 *Business and Assets to be Transferred*, the following paragraph appears:

PCBs were used to insulate electrical devices such as capacitors. Because they are environmentally persistent and may pose a serious health threat, Congress singled out PCBs for special attention and regulation under TSCA. 15 U.S.C. § 2601. In section 6(e) of TSCA, Congress provided that, effective January 1978, "no person may manufacture, process or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner" except as may be authorized by the Environmental Protection Agency (EPA). 15 U.S.C. § 2605(e)(2)(A).

The Greencastle and Glasgow plants manufactured tantalum and aluminum electrolytic capacitors.

Notwithstanding any provision in this Agreement to the contrary, the business and assets of the Mallory Components Group to be transferred to Purchaser shall not include any raw materials, inventory, finished goods, work in process, scrap or waste containing or contaminated with any chemical substance containing polychlorinated biphenyls (PCB) located at Seller's Waynesboro, Tennessee plant (the "PCB Materials").

On page 9, as part of section 6, *Assumption of Certain Liabilities by Purchaser*, the Purchase Agreement states:

Anything in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that the Purchaser does not assume or agree to be responsible for, and Seller hereby agrees to indemnify and hold Purchaser harmless from and against any and all claims, obligations and liabilities and all costs, expenses and attorneys' fees incurred, based upon or arising out of:

. . . . . .

(g) Any obligation, liability, loss, damage or expense, of whatever kind or nature, contingent or otherwise, known or unknown, incurred under, or imposed by, any provision of Federal, state or local law or regulation, or common law, pertaining to health, safety or environmental protection and arising out of any act or omission by Seller, its employees or representatives prior to the Closing Date, including without limitation, such laws or regulations pertaining to the storage, transportation, handling, disposal, dis-

---

**12.** PCB oil was used at Waynesboro from October 1969 through June 1978. The capacitor container was filled with PCB oil and then the container was heated in the impregnation room. When the impregnation chambers were opened a supersaturated cloud of PCB vapor dispersed throughout the plant, condensing on everything. Oil was occasionally dumped on the ground outside and a substantial amount of spillage occurred inside the plant. Before Emhart acquired the plant, TCE was used on a daily basis to clean the floor of the impregnation room.

charge, presence or use of polychlorinated biphenyls (PCB) or any substance containing PCBs.

In addition, Seller expressly accepts sole responsibility for any raw materials, inventory, finished goods, work in process, scrap, waste, residue or discharge containing or contaminated with PCBs or any substance containing PCBs which Seller has not removed from any premises of the Mallory Components Group as of the Closing Date. At the Closing, Seller agrees to deliver to Purchaser the absolute and unconditional guarantee by Dart Industries Inc. of Seller's obligations as set forth in this subsection (g).

It is understood and agreed that the obligation of each party to indemnify and hold harmless the other party as set forth in this Section 6 shall survive the Closing and shall be a continuing obligation not subject to any of the limitations set forth in Section 26 below.

Section 10 *Representatins and Warranties of Seller* states:

Seller represents and warrants that, except as provided on the exhibits attached hereto, the numbers of which correspond to the numbers of the applicable subsections contained herein:

. . . . .

(aa) Except as listed in Exhibit 10(aa), the operations of the Mallory Components Group are to Seller's knowledge in compliance with all applicable state and federal laws and regulations pertaining to health, safety or environmental protection. Exhibit 10(aa) also sets forth with respect to the operations of the Mallory Components Group to be purchased hereunder all locations at which polychlorinated biphenyls (PCB) or any substance containing PCBs have at any time prior to the Closing been located, used or stored;

The referenced exhibit, 10(aa), provides in full:

Inspection made by Federal Occupational Safety and Health Administration of Mallory Capacitor Company plant in Hunts-

ville, Alabama, in June, 1979. Formal citation expected to be issued on approximately August 1, 1979. Violations deal primarily with noise and air quality levels in the plant. Measures already begun to correct violations. No significant compliance problems anticipated at this time.

———

Of the operations to be acquired by Purchaser, polychlorinated biphenyls have only been located, stored or used at Waynesboro, Tennessee.

The Purchase Agreement contained, in section 13 *Conditions to Purchasers Obligation to Close,* two provisions relevant to this litigation.

The obligations of Purchaser to close the transactions contemplated hereunder shall be subject to the satisfaction on or prior to the Closing Date of the following conditions, each of which is agreed to be material. Any of such conditions may be waived by Purchaser (but only in writing), and, notwithstanding the failure of any one or more of such conditions, Purchaser may nevertheless proceed with the Closing without satisfaction in whole or in part of one or more of such conditions and without written waiver, and Purchaser shall not be deemed to have waived any rights or remedies it may have against Seller by reason of the failure of any of such conditions:

. . . . .

(j) Seller shall have removed the PCB Materials from Seller's Waynesboro, Tennessee plant to be conveyed to Purchaser, in accordance with applicable laws and regulations, or Seller shall have formulated a plan and schedule whereby such removal will be accomplished no later than six (6) months after the Closing Date and such plan and schedule of removal shall be submitted to the government agencies having jurisdiction over any of the activities pertaining to such removal, and Seller shall exert its best efforts to

obtain all required approvals and authorizations;

. . . . .

(m) Purchaser shall have received the guarantee executed on behalf of Dart Industries Inc. of Seller's obligation to indemnify and hold Purchaser harmless as set forth in subsection (g) of Section 6;

Section 26, referred to specifically in section 6(g), creates a contract statute of limitations:

> The representations, warranties and covenants contained in this Agreement shall survive the Closing, it being understood and agreed, however, that, except as otherwise provided in this Agreement, neither Seller nor Purchaser may make any claim or demand against the other based upon any alleged breach of any covenant or alleged breach, untruth or inaccuracy of any representation or warranty unless such claim or demand be in writing and delivered to the party alleged to have committed a breach of any covenant or a breach of, or made any inaccurate, representation or warranty, within three (3) years from the Closing Date.

The Purchase Agreement in section 38 has a choice of law provision: "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Connecticut."

The Guaranty that Emhart required from Dart was authorized on July 25, 1979 by Dart's Board of Directors. The Guaranty reiterated the obligations set forth in section 6 of the Purchase Agreement:

> WHEREAS, in Section 6 of the Purchase Agreement (pertaining to the assumption by Purchaser of certain defined duties, liabilities and obligations of the Mallory Components Group), it is expressly provided:
>
> (1) that Purchaser does not assume or agree to be responsible for any obligation, liability, loss, damage or expense, of whatever kind or nature, contingent or otherwise, known or unknown, incurred or imposed by any provision of Federal, state or local law or regulation, or common law, pertaining to health, safety or environmental protection and arising out of any act or omission by Seller, its employees or representatives prior to the Closing Date, including without limitation such laws or regulations pertaining to the storage, transportation, handling, disposal, discharge, presence or use of polychlorinated biphenyls (PCB) or any substance containing PCBs; and
>
> (2) that, in addition, Seller expressly accepts sole responsibility for any raw materials, inventory, finished goods, work in process, scrap, residue or discharge waste containing or contaminated with PCBs or any substance containing PCBs which Seller has not removed from any premises of the Mallory Components Group as of the Closing Date; and
>
> (3) that, Seller agrees to indemnify and hold Purchaser harmless from and against any and all claims, obligations and liabilities and all costs, expenses and attorneys' fees incurred, based upon or arising out of the matters set forth in (1) and (2) above; and
>
> (4) that, the obligation of Seller to indemnify and hold Purchaser harmless as stated in (3) above is a continuing obligation and not subject to any of the limitations as to duration or amount set forth in Section 26 of the Purchase Agreement.

The Guaranty then provided

> A. Guarantor does hereby guarantee absolutely and unconditionally the prompt and complete performance by Seller of Seller's obligation to indemnify and hold Purchaser harmless as hereinabove set forth, and does hereby agree that if Seller shall at any time default in its performance of such obligation, Guarantor shall, upon demand of Purchaser, promptly remedy such default.
>
> B. This Guaranty is continuing, absolute, unconditional, unlimited, and irrevocable. This Guaranty and the transactions contemplated by the Purchase Agreement constitute a single transaction. Guarantor hereby waives notice of any default or nonfulfillment by Seller of any of its obligations as hereinabove set

forth, and waives the benefit of any Statute of Limitations affecting its liability hereunder or the enforcement thereof.

C. Guarantor agrees to pay all attorney's fees and all other costs and expenses which may be incurred by Purchaser in the enforcement of this Guaranty.

D. This Guaranty shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of Purchaser, its successors and assigns.

Dart's Guaranty was delivered to Emhart at closing.

In an effort to fulfill its obligation under section 13 of the Purchase Agreement to remove the "PCB Materials," Duracell hired Holley Electric. The condition precedent, removal of the PCB materials, proceeded under the plan and schedule option of section 13(j). The plan was annexed to the Purchase Agreement as Exhibit 13(j); it was drafted by Duracell's attorney.[13]

The PCB Materials referred to in Section 13(j) of the Agreement described above will be removed from the Waynesboro plant premises within six months from July 30, 1979. With respect to the underground PCB containing tank, Mallory shall either pump out the PCB, flush with an appropriate solvent, and, if desirable, fill with cement, or pump out the PCB, flush and remove the tank from the premises.

With respect to the PCB-contaminated water in the subbasement area of the plant premises, Mallory shall take such action as may be required by any law, regulation, governmental authority or court order.

The PCB Materials are presently being stored at the Waynesboro plant pending the approval by the Federal EPA of incinerators designed to dispose of such materials. Within six months from July 30, 1979, Mallory will either ship the PCB Materials directly to an incinerator which is approved by the Federal EPA or to an approved temporary storage facility where such materials will be held until an approved incinerator is available.

Mallory further agrees to take all such other or further action as may be required by any law, regulation, governmental authority, or court order in connection with the subject matter of Section 13(j) of the said Purchase Agreement.

The Purchase Agreement was executed on July 30, 1979.

C. *Post Sale Operation of the Waynesboro Plant*

Holley Electric performed a clean-up of Waynesboro. The clean-up included filling the basement with concrete, removing stored drums of PCBs and removing and disposing of two underground storage tanks containing PCBs.[14] Duracell and Emhart knew that some PCBs would remain after the clean-up. The Purchase Agreement itself contemplates that PCB residues would remain at Waynesboro after Duracell removed the PCB Materials. The contract definition of PCB Materials includes "any raw materials, inventory, finished goods, work in process, scrap or waste." Purchase Agreement, section 3. Duracell retained responsibility not only for the defined PCB Materials, but also for "any ... residue or discharge containing ... PCBs." Purchase Agreement at section 6(g). Both parties understood that some PCBs would remain after the Holley Electric clean-up and that those residues would be the responsibility of Duracell.

Emhart never used PCBs at the Waynesboro facility. However, after the 1979 sale, Emhart found that the amount of PCBs being discharged into the Green River was not diminishing over time as required by a National Pollutant Discharge Elimination System Permit issued by EPA. The permit imposed an effluent limitation

---

**13.** In July of 1979 Duracell was still known as P.R. Mallory. *See* note 10 *supra.*

**14.** During the clean-up 115 drums of waste were discovered in an auxilliary room adjacent to the main facility. These leaking drums contained PCBs that were flowing across the pavement and into the North Drain. The North Drain empties into the Green River. The drums were removed and the room cleaned.

of 10 ug/liter [15] as of October 1, 1979. On September 28, 1979, Peter Voysey, Emhart's Group Counsel for the Mallory Components Group, contacted Region IV EPA about a modification of the effluent limitation. An October 4, 1979, confirmatory letter from Peter Voysey to Gregg Dwyer relates that Dart, Duracell and Emhart had agreed on September 28, 1979 that Emhart would initiate and handle the modification of the NPDES Permit. Emhart also handled the evidentiary hearing on modification in cooperation with Duracell.

Emhart manufactured capacitors at Waynesboro until the plant was closed. For some period of time Emhart continued Duracell's practice of mopping the impregnation room three times a day with TCE, a degreaser. At least two years before the shut down Emhart switched to a detergent type cleaner for routine use and reserved the TCE for specialized purposes. Two to four gallons of TCE per week were used at Waynesboro after the switch to a detergent cleaner. TCE is a solvent and readily dissolves PCBs. The dissolved PCBs can leach into the concrete floor and ultimately the ground. PCB and TCE covaporize, increasing the air borne levels of PCB temporarily. In addition TCE is considered toxic in its own right.[16]

After acquiring the Waynesboro plant Emhart made substantial expenditures for capital improvements and research and development of a new product line: metallized film capacitors. Emhart's market share increased for both types of capacitors manufactured at Waynesboro during the period that Emhart operated the plant. The building recession of 1982–3 decreased industry sales overall by about 25 percent. This decrease combined with the large research and development expenditures made Waynesboro appear to be less profitable to operate than its actual performance indicates.

### D. *Discovery of Unacceptable PCB Levels to Temporary Shutdown*

In early 1984, Emhart contracted to send TCE wastes generated at Waynesboro to Safety-Kleen Recycling. On May 31, 1984, Safety-Kleen notified Emhart that the wastes contained unacceptable levels of PCBs. After Safety-Kleen confirmed the test results, Doug Clark, an environmental engineer employed by Emhart, conducted an investigation of the plant to confirm the presence of PCBs and to determine the likely sources of contamination. Mr. Clark used a "biased" sampling technique to determine concentrations of PCBs near probable sources of contamination. Although much was made at trial about the biased technique, the Court is satisfied that importation of the pejorative connotation of bias in lay terms to statistical applications is inappropriate. Dr. Tom Marshall, a toxicologist who testified for Emhart, testified that biased sampling statistically means anything other than purely random sampling, as by a grid pattern. There was further expert testimony that random sam-

---

**15.** The trial of this case thus far has included a great quantity of technical proof on the safety or danger of PCBs. Courts which daily employ the dialectic of law are poorly suited to the empiricism of science. Law's search for justice is of a different stuff from Science's search for truth. Lawyers, the last, true Renaissance members of society, fall easily into a feeling of instant expertise and unfortunately come to believe that expertise. *Cf. Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (Three generations of imbeciles are enough.)

This Court has no intention of deciding questions of science that leave scientists uncertain. However, this Court is confident that the basic terms and measurements of technology are easily mastered. Now that the first reference to almost impossibly tiny metric measurements has appeared, the measurement of PCBs should be explained. A microgram, properly designated as $\mu$g but often seen as ug, is a millionth of a gram. A microgram is to a gram what one second is to 12 days. PCBs can be measured on surfaces, in bulk, in liquids and in air. On surfaces the concentration is usually expressed as ug/100cm$^2$, micrograms per hundred square centimeters. In bulk, such as concrete cores, the unit is usually parts per billion (ppb) or parts per million (ppm). In liquids the units are either the same as used for bulk or milligrams per liter. In air, the unit is usually ug/m$^3$, micrograms per cubic meter. There are no uniform, established safe levels of PCBs.

**16.** Waste TCE is regulated by federal hazardous waste regulations promulgated under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6905. 40 CFR § 261.31.

pling is not appropriate for the objectives of determining the source and extent of contamination.

Mr. Clark's samples were analyzed by International Technology (IT) Corporation between June 25 and July 27, 1984. Liquid samples showed concentrations of 520 ppm PCBs in the oil in the vacuum pumps; 320 ppm in the bottom of the old still; 930 ppm in the oil residue in the vacuum pump vent stack. Bulk samples showed levels of 230 ppm in insulation around the impregnation tank; 920 ppm on a steel grinder above the impregnation tank; 360,000 ppm in the insulation around the mixing tanks; 2,100 ppm in plant floor scrapings;[17] 1,200 ppm in shipping floor scrapings; 5,900 ppm in boiler room floor scrapings; 930 ppm in sweepings from from the chemical laboratory; and 990 ppm in sweepings from the lunch room. Ceiling samples ranged from 69 to 2,100 ppm, including levels of 69 ppm in the lunchroom, 310 ppm in the main office, and 2,100 ppm in the plant. Surface samples revealed concentrations of 35 ug/100cm$^2$ on the fire exit door handle and 210 ug/100cm$^2$ on the impregnation room floor.[18] Air sampling disclosed PCB levels of 3.9 ug/m$^3$ in the lunchroom; 20 ug/m$^3$ in the shipping area; and 530 ug/m$^3$ in the outside vent stack of the impregnation room. Mr. Clark concluded that "the PCB contamination of the Waynesboro facility was surprisingly widespread … very high levels."

On June 27, 1984 John Blatz, a staff attorney with Emhart, notified Theodore Banks, a staff attorney with Duracell, that Safety-Kleen had discovered PCBs in the solvent and that Emhart was investigating how PCBs got into the solvent. Emhart and Duracell remained in contact by telephone. On July 13 and 17, Emhart sent Duracell the lab analysis showing the location and level of PCB contamination detected at Waynesboro.[19] Emhart arranged for Romer Wilsek, Dart's manager of environmental control to tour the Waynesboro plant. He did so on July 20, 1984. On July 24, 1984 James Saylor, Superintendent of Environmental Health for Aetna Casualty and Surety Company's Commercial Insurance Division, met with Walter Jaeger of Emhart in Connecticut. Mr. Saylor concluded that the samples he needed for an accurate evaluation were not yet available. However, if the concentration of airborne PCBs were relatively low and "far below the threshold limit values on these substances," then the "over all situation should not be treated as a panic situation." As a preliminary effort, Mr. Saylor recommended a clean-up level of 5 ppm for the floor. Defendants' Ex. 21.

The first written contact between Emhart and Duracell, other than test results, was a letter dated July 24, 1984 from John Blatz to Ted Banks. This was a demand letter apparently prompted by a July 23, 1984 telephone conversation:

I now understand from our further phone conversation yesterday that both you and your outside counsel are taking the position that the indemnities and warranties may not cover the situation at the Waynesboro facility. We emphatically disagree and hereby demand that Dart & Kraft and P.R. Mallory & Co., Inc. [Duracell] confirm their intention to stand behind their respective indemnities and guaranties.

Plaintiff's Ex. 40. In addition to the direct demand the letter sought assistance in

---

**17.** Another plant floor bulk sample was erroneously reported as a wipe sample. Analyzed as a wipe sample, the PCB concentration was 19,000ug/100cm$^2$. The error was not discovered until after the decision was made to temporarily close the plant.

**18.** A concentration of 19,000 ug/100cm$^2$ was reported for the plant floor due to a sampling error. See note 17 supra.

**19.** On July 13, Mr. Clark sent a memo to Mr. Carrier recommending that experts be hired to handle the decontamination and that full disclosure be made. Because of the solvents used in a PCB clean-up, Mr. Clark was of the opinion that an incremental clean-up while production continued in other parts of the plant was not feasible. The memo concludes: "This discussion, of course, assumes that Dart & Kraft does not take the lead in a clean-up operation. Please advise how I am to proceed." Defendants' Ex. 19. At that time Dart was a wholly owned subsidiary of Dart & Kraft.

coordinating responsibility for "further investigation and any necessary remedial activity." Emhart suggested either that Duracell and Dart take direct responsibility or that Emhart conduct the response and bill back to Duracell and Dart.

Duracell received the letter on July 25. On July 27, Ted Banks called John Blatz. Subsequent correspondence indicates the substance of that telephone call. Apparently Duracell took the position that Duracell and Dart would honor the indemnity and guaranty. Dart and Duracell wanted Emhart to continue testing and to form an opinion as to what kind of clean-up was appropriate. Emhart interpreted this conversation to be a selection of the bill back option in the letter of July 24, 1984.

Also occurring on July 27 was a meeting in Farmington, Connecticut, between Emhart management and expert consultants. Dr. Thomas Marshall, a doctor of toxicology employed by IT, advised Emhart that the level of PCB contamination was "alarmingly high." Dr. Marshall informed Emhart that the data he had available to him indicated sufficiently high levels of PCB to concern any reasonable toxicologist. Dr. Marshall also warned Emhart management about the dangers of dibenzodioxins (dioxins) and dibenzofurans (furans). Dioxins and furans are formed when PCBs are heated; they are thought to be more toxic to humans than PCBs.[20]

Dr. Marshall had the results of the Clark samples available to him at the July meeting. Although Duracell argued that those results are not reliable, Duracell concedes that Emhart and Dr. Marshall did actually perceive the PCB levels to be alarmingly high. Dr. Marshall advised Emhart that based on the high surface concentrations that had shown up on the sampling, there was a potential for some of the short-term exposure to be sufficiently high to cause concern about long-term health effect. By way of comparison Dr. Marshall told Emhart that clean-up criteria of 1 ug/100cm$^2$ had been required by California state officials for an office building. Dr. Marshall told Emhart that the NIOSH standards for air contamination were 1 ug/m$^3$ and said that "even if I felt that PCBs were not very toxic as a hypothetical, knowing the regulatory evidence surrounding PCBs and the opinions about what are considered to be safe levels of exposure through NIOSH, those conditions at the plant did represent serious situations that needed to be addressed."

At the July 27 meeting, outside legal counsel for Emhart expressed the opinion that operation of the equipment at Waynesboro was illegal under TSCA. The penalties could be either civil or criminal or both and ranged as high as $25,000 a day and one year imprisonment. The TSCA regulations were less than a month old at the time of the meeting. Further, it came to Emhart's attention that Holley Electric, the contractor used by Duracell in the clean-up,[21] had pled guilty to a criminal indictment under TSCA for PCB related violations. Holley had been fined $35,000 and placed on two years' probation. Although the criminal case was not related to the Waynesboro site, it certainly could cause a reasonable property owner some concern.

The information available to Emhart on the weekend of the 27th was

—remarkably high levels of PCB contamination had been found at Waynesboro;

—the levels were high enough to trigger some immediate concern about employee health and thereby civil duties;[22]

**20.** Indeed, IT Corporation did discover dioxins and furans in two of six samples taken on September 5, 1984. A memo from IT to Emhart dated October 5, 1984 indicates that Emhart was informed of these results in mid to late September. Defendants' Ex. 45 and 54.

**21.** Two clean-ups at Waynesboro have already occurred. When PCB use was discontinued in 1978 the plant was cleaned up; when Duracell transferred the plant to Emhart, a Holley Electric clean-up was done.

**22.** A great deal was made at trial of Emhart's decision not to give employees blood tests. Several experts testified that blood tests for PCBs would be useful to determine what health consequences could be expected from the PCBs. However, even the most reassuring PCB test results would not have changed the regulatory requirements for Waynesboro clean-up. Further, it is reasonable to assume that blood tests would have heightened employee concern and

—the levels and locations indicated criminal violations of TSCA for each successive day of operation;

—the plant could be cleaned within a reasonable period;

—Duracell and Dart were not eager to honor the indemnity and guaranty provisions.

Based on this information, William Lichtenfels, President and Chief Executive Officer of Emhart, decided to close the plant on a temporary basis. He also decided, on advice of counsel, that a section 8(e) notice under TSCA was required. 15 U.S.C. § 2607(e). That notice was sent to EPA on July 27, 1984. A letter confirming the weekend meeting results was sent to Dart and Duracell by Emhart on July 31 by Federal Express. This letter demanded again that Dart and Duracell give assurances of their willingness to stand by their obligations.

### E. *Temporary Shutdown to Permanent Closing*

In response to Emhart's notice of temporary shutdown, Dart through Ted Banks sent a letter to Emhart. Dart took the position that the section 8(e) notice "gave rise to the termination of our indemnity . . . [and] was an act of noncooperation that cuts off our liability to indemnify the consequences of your conduct." Dart stated

> Closure of the plant was also unnecessary. This act may create an economic loss to Emhart that is entirely avoidable, and Dart & Kraft will not indemnify Emhart for these losses. Further, the plant closure will erroneously alarm employees, and create a fear of health hazard that as far as we know is unsupported by the test results received to date. Dart & Kraft will not indemnify Emhart for any actions brought by employees or the community of Waynesboro as a result of these actions.

As to clean-up Dart took the position that it would not indemnify Emhart for any clean-

up "liability or costs connected with EPA proceedings or requirements deriving from the ill-advised notification." The letter implied that the Holley Electric clean-up discharged the contractual obligation, but offered to meet and discuss a settlement of the PCB issues. Plaintiff's Ex. 42.

On August 2, 1984, Emhart and Duracell met with the EPA in Atlanta to discuss what Emhart needed to do to comply with TSCA.[23] A letter from the EPA dated August 24, 1984, received by Emhart August 30, forwarded to Dart that day and received by Dart September 4 recapitulates the results of several contacts with EPA in early August. EPA took the position that "the description of decontamination procedures was to indicate how the facility might proceed toward achieving any regulated level of PCB." The statement was not intended as a warranty "against future violations of the PCB regulations or as a hedge against future reductions in allowable levels of PCBs in oils." The EPA recommended a target clean-up of $10ug/100cm^2$ in areas not visited by personnel: "This number by no means represents a standard but it has been used as a recommended level of clean-up of hard smooth surfaces of equipment." After warning of the penalties for noncompliance and noting the general terms of a negotiated settlement, the letter concluded:

> We advise that a record be kept of all of your activity and that rationale for activities be documented whenever and where ever possible. We are expediting review of the compliance inspection [of August 14] with the hope that the entire matter of the continued operation of your facility in compliance with the PCB regulations can be established and can be expected to continue.

This is hardly the prompt, clear, and unceremonious rejection of Emhart's fear of illegality that Duracell claims occurred. Indeed, the September 13, 1984 letter from William Ruckelshaus, Administrator of EPA, to Senator Jim Sasser, which Dura-

increased the likelihood of litigation, to any indemnitor's detriment.

**23.** Notes from this meeting indicate that Dart took the position in this meeting that it was not responsible.

cell argues makes legality of operation crystal clear, actually further supports the proposition that operation without clean-up was illegal: EPA "has provided company officials with a description of equipment decontamination needs and ways the factory could operate in compliance with the Toxic Substances Regulations." Defendants' Ex. 48.

Emhart also met with the Tennessee Occupational Safety and Health Administration (TOSHA) during August of 1984. Although advised of the meeting, Duracell and Dart elected not to attend. TOSHA recommended a 2ug/100cm$^2$ clean-up criteria, but Emhart convinced TOSHA that 10ug/100cm$^2$ was an acceptable level for all areas except the lunchroom; in the lunchroom, TOSHA insisted on 2ug/100cm$^2$. Defendants' Ex. 33. The 2ug/100cm$^2$ level would have required extensive work and might have damaged the equipment.[24] TOSHA concurred in the 10ug/100cm$^2$ level by letter dated October 1, 1984.[25]

In addition to meetings with regulatory agencies, Emhart and Duracell met several times during the August to September period. At the August 22 meeting Dart was informed that Emhart did not know if it would reopen Waynesboro or would move to another location. At an August 27 meeting Dart offered a lump sum settlement for an undetermined amount, but declined to take the plant back. Emhart as of August 27 "decided to proceed with a program to clean up on site and buildings, including removal and replacement of the roof, in an attempt to reduce PCBs to currently recommended levels."[26] According to notes from a staff meeting the next day, Emhart's position was to "get on with job—let lawyers go on arguing."[27] Defendants' Ex. 37. Throughout this period Emhart's view was that by mid-to-late November the plant had to be reopened or a new facility on line.

Emhart solicited clean-up proposals[28] and did further testing. Between August 30 and September 1, 1984, a team from IT under the direction of Leo Brausch conducted further sampling at Waynesboro to fill data gaps. This sampling, which was done on a rush basis, included core samples of the concrete floor, sediments from the Green River, soil outside the plant, groundwater beneath the site and sections of the roof. Emhart received four clean-up proposals before the Brausch results were available. Emhart forwarded these proposals to Duracell and Dart and solicited their comments on the proposals on September 10, 1984. The proposals, which dealt with only the building, not the grounds, were based on specifications that Emhart had provided to Dart and Duracell before seeking proposals. Emhart notified Dart in a transmittal letter accompanying the proposals that it would meet with two of the contractors on the twelfth and hoped to reach a decision by September 17. The proposals were sent by Federal Express.

Two of the clean-up proposals involved total removal of the roof and portions of the floor. One involved partial removal of the roof. The IT proposal, one of the roof removal pair, was estimated to cost $1 million dollars plus $150,000 to remove and replace the roof. Dart and Duracell did not join in the decision making process by September 17 when Emhart had hoped to decide what to do. On September 19 representatives of Dart and two environmental consultants retained by Dart visited the plant and Dart informed Emhart that these

---

**24.** The concerns about a 2 ug/100cm$^2$ clean-up level were expressed in an August 27 meeting with TOSHA. The need to get people back to work before economics forced valuable employees to take other jobs and the need to re-enter the market before losing market share were emphasized to TOSHA. Defendants' Ex. 54.

**25.** Actually the October 1 letter had a typographical error showing 10ug/cm$^2$; this error was corrected in a latter letter from TOSHA.

**26.** Also, at the August 27 meeting Emhart decided to undertake testing of other Mallory sites.

**27.** The Court notes that Emhart did and the lawyers have.

**28.** Duracell did not submit a decontamination proposal until January 22, 1985. That proposal was subsequently rejected by Duracell's most recent environmental consultant as inadequate due to its reliance on the use of sealants.

consultants would finish their review by September 26.

At some point in early September [29] Emhart received the results of the Brausch tests. These test results, most notably the core samples of the concrete floor, made the proposals for clean-up obsolete and the cost estimates far too low. Several samples contained levels of thousands of parts per million. Emhart notified Duracell of these changed circumstances on September 18. Emhart decided to look at constructing a new plant while continuing operations in a temporary facility in Collinwood, Tennessee, and notified Duracell on September 28 that "an acceptable clean-up of the facility is not practicable from an economic and business standpoint." Plaintiff's Ex. 45. The state of the outside experts' view of a clean-up on September 28, 1984 was that the floor and roof would have to be removed and that the walls had not yet been tested to see if they should be removed in order to effect a clean-up. Therefore, Emhart decided "to shut down the Waynesboro facility permanently, decontaminate the equipment at the facility (provided it can be cleaned down to acceptable levels), and move it to a temporary facility in Waynesboro area pending construction of a new plant." Plaintiff's Ex. 45.

### F. Permanent Shutdown to Decision to Abandon Equipment

Emhart leased a temporary facility in Collinwood, Tennessee, to resume manufacturing and set aside $1.5 million to decontaminate the equipment. A $3.5 million capital expenditure authorization was prepared for the building of a new plant. Emhart solicited bids for the decontamination and received two proposals. IT submitted a bid on a time and materials basis with no guarantees. IT estimated that 50 percent of the equipment would need to be decontaminated and estimated that the cost would be

$1.5 million. ENSCO, another environmental contractor, submitted a fixed price bid of $807,000.

On October 16, 1984, Emhart sent Duracell further Waynesboro sampling data and the equipment clean-up proposals from ENSCO and IT.[30] Emhart invited Duracell's comments and urged that the parties meet to discuss the situation. By letter dated October 19, 1984, Duracell responded to Emhart's letters of September 28 and October 16. Duracell disagreed with Emhart's conclusions: "Let me state very emphatically that it is the considered opinion of our consultants that a clean up of the equipment and the facility (where appropriate) is both economically feasible and technologically possible." Duracell again asserted that Emhart's "conduct here has voided any indemnity obligation we might have." Defendants' Ex. 61. Nonetheless, Duracell urged that an amicable resolution be sought.

Emhart accepted the ENSCO low bid for equipment decontamination and, at Duracell's urging continued investigation into a plant clean-up. IT took further samples and at a November 1984 meeting advised Emhart that major soil excavation from underneath the plant would be necessary to remove the contamination. This would require partial demolition of the plant.

On November 21, 1984, ENSCO repudiated its contract with Emhart for the equipment clean-up.[31] Plaintiff's Ex. 23. Emhart then asked IT to reactivate and update its equipment decontamination proposal. On December 7, 1984, IT submitted a proposal to clean the equipment with a cost range of $816,000 to $1,267,791 depending on what percentage of the equipment required cleaning. On December 21, IT submitted a revised estimate. This estimate was based on a revised equipment list, a decision to use only permanent IT employees with no local hires, a detailed sampling

---

29. Lab results were telephoned to Emhart as they became available. The written record appears in final form as an October 25, 1984 Report and Preliminary Assessment.

30. Emhart also sent some sampling data on Glasgow. See § II H infra.

31. The letter simply notes changed circumstances. The deposition of Doug Clark indicates that he performed a test of the ENSCO clean-up technique and found that it did not significantly reduce PCB contamination on the equipment.

plan to support the work plan, and the addition of inventory and document recovery to the proposal. The most likely cost to Emhart was listed as $1,268,000, $209 over the highest cost on the December 7, 1984 proposal. Neither proposal guaranteed the cost, the effectiveness of the clean-up, or the operativeness of the equipment after clean-up.

Emhart transmitted the IT proposal to Duracell. In a January 11, 1985 letter Emhart outlined its reservations about the contract to Duracell. However, Emhart noted that "the methodology set forth in the enclosed contract are the best available techniques for decontaminating the equipment at the facility, and that the terms and conditions of the contract represent the most favorable terms available from reputable and experienced contractors." Plaintiff's Ex. 68. Emhart stated that it needed to act swiftly and asked Dart to notify Emhart immediately if Dart felt that any of the work was unnecessary or incorrect or if Dart could obtain better terms for it. Emhart ultimately decided not to attempt an equipment clean-up at all, even though equipment clean-up tests indicated that clean-up was possible and did not damage the equipment.

G. *Equipment Abandonment to Present*

Duracell first submitted a clean-up proposal in January 1985. This proposal, by Recra Research, Inc. defined the scope of the work required to clean the plant and equipment, but did not recommend or select a contractor. No contractor for the proposed work was listed until March 1985 when OH Materials (OHM) was named. The Recra plan relied in part on the use of sealants to attempt to contain the PCB contamination in the concrete floor. The use of sealant is not technically sound, although it is inexpensive.[32] Emhart's experts rejected Recra's sealant proposal in January 1985. Nonetheless, Duracell continued to pursue a sealant solution. However, even Duracell's current consulting experts Conestoga-Rovers Associates have categorically rejected sealants as a solution to this contamination.

At this point Emhart had been out of the market for about six months. No proposal had been satisfactory to both Emhart and Duracell, and there was some risk that clean-up expenditures would have to be borne by Emhart both initially and permanently. Duracell was not motivated by the legitimate concerns of Emhart: time out of production, long term adequacy of clean-up, and economically efficient use of money expended. Emhart was not motivated by the legitimate concern of Duracell: least cash outlay possible.[33] Emhart, acting with the knowledge that it might have to bear the costs alone, investigated continuing the Waynesboro operation in a new site and abandoning all Waynesboro operations by acquiring a new company.

In deciding not to continue Waynesboro operations at all, Emhart considered the cost attendant to added delay for partial

---

32. Sealants require constant maintenance since any break in the sealant surface allows PCBs to leak out. Breaks are almost impossible to avoid in a factory setting. Even if perfectly maintained, sealants cannot prevent diffusion migration of the PCBs.

33. Although the actual numbers have not yet been proven, some general principles are clear. The plant can be cleaned up enough to abandon it without posing a release risk for less than it would cost to clean it up and use it. The difference in the two figures will be enough so that a decisionmaker who is engaged in production ought to consider whether the difference should be invested in enhancing production capacity by abandoning the plant. However, a decisionmaker motivated only by contract terms is inclined only to reduce the cost of clean-up and use. Emhart, a decisionmaker engaged in production, acted in good faith when it decided that its money should not be invested in an expensive and uncertain effort to clean up and use Waynesboro, since for that money it could obtain better production facilities. The parties have allocated the economic risks among themselves by contract. Although their decisions may lead to diseconomic results, the parties have freely and knowingly made the decisions. The economic reasonableness of Emhart's actions is relevant to show its good faith. Every contract has an implied duty of good faith. Although the contract terms may foreordain an unreasonable result, there nonetheless remains on each party a duty to act with good faith and fair dealing within the context of their differing, diseconomic incentives.

equipment clean-up and the possible delay if some of the equipment either could not be cleaned or would not work after cleaning. The test clean-up conducted indicated that the latter two possibilities were not very likely. Nonetheless, Emhart decided to acquire a new company, Arcotronics. In May, 1985, Emhart completed acquisition of Arcotronics. Arcotronics "had good mechanical ability in assembly equipment" and Emhart "saw a future benefit in the type of equipment they were capable of making to automatically assemble dry metalized film capacitors." T. 126–29 (3/26–3/27).[34]

Although Emhart is currently seeking to sell the capacitor production facilities acquired in 1979, it has obtained a clean-up proposal from IT. This proposal is estimated to cost approximately $7 million and to take seven months. This proposal does not guarantee that the equipment would operate, that the plant structure would be sound or stable, or that the decontamination would be any more permanent than the last two. One IT engineer, Robert Palmer, expressed the opinion that the structural work alone, exclusive of decontamination of the equipment could run as high as $2 million. Duracell's engineer prepared a plan for the facility with an estimated cost of $2.5 million. The Court, having observed the witnesses and weighed both the substance and the manner of their testimony, finds that the clean-up criteria and cost of that clean-up as estimated by IT are excessive in this case. This is not to prejudge the appropriate quantum of damages; that is not at issue yet.

## H. *Other Facilities*

In the fall of 1984 while Emhart was investigating PCB contamination at Waynesboro, Emhart discovered that the other Mallory Capacitor facilities might also be contaminated. Emhart discovered PCBs at Glasgow, Greencastle and Indianapolis. Although it is not clear how each facility came to be contaminated, it is un-controverted that Emhart never used PCBs at any facility. Emhart did discover that contrary to the representations in the Purchase Agreement, PCBs had been used at Glasgow in reclaimation prior to 1979. The actual discovery of PCBs and notice to Duracell did not occur within three years of the sale. However, Duracell's former employees who had actual knowledge of PCB contamination became Emhart employees at the time of sale. Also, a number of officers and agents of Duracell's Mallory operations became Emhart's officers and agents at sale.

In May 1985, IT prepared a clean-up proposal for the other facilities. The proposal suggested that normal housekeeping type clean-up be done and contained no numerical standards for the clean-up. The Glasgow facility, which had the most extensive contamination of the other facilities, was to be cleaned in two phases. After the basic housekeeping clean-up, IT recommended a second phase using numerical standards. This proposal was communicated to Dart and Duracell. By letter dated June 17, 1985, Dart and Duracell offered "to undertake a state-of-the-art cleanup" at the facilities. Defendants' Ex. 73. Although Dart and Duracell stated that they had retained Conestoga Rovers (C–R) to do the clean-up and that they wished to proceed as soon as possible, no actual proposals were made until August. No work plans were submitted until November 1985. In December, Emhart rejected the plans because they had no numerical standards. The December 4, 1985 letter raised nine points of disagreement with the C–R plan: no standards of clean-up, inadequate cleaning plans, no tests for effectiveness, no consideration of possible damage to cleaned surfaces, no continuing responsibility, no provision for regulatory approval, no consideration of work schedules at the facilities, and no clear delineation of performance and procedural specifications. Emhart also expressed concern about the use of C–R as a consultant or contractor because of CR's unfamiliarity both with PCBs and with

---

**34.** The transcript for that portion of the trial conducted on March 26 and 27 is not paginated sequentially.

American regulations. C–R is a Canadian company.

Dart and Duracell responded on January 9, 1986, rejecting all of the criticisms Emhart had leveled. Clean-up of the other facilities apparently remained at an impasse until March 7, 1986, when Emhart sent Duracell its work plans for clean-up of the Indianapolis facility. Emhart did clean up the Indianapolis facility based on clean-up levels recommended by IT. The reasonableness of that expenditure is disputed, but only partly at issue in this phase of the lawsuit. Emhart has also completed phase one of the Glasgow clean-up at a cost of $1.5 million, whose reasonableness is similarly only partly at issue. Apparently, no clean-up has been done at Greencastle to date.

### III. Conclusions of Law

#### A. Conflict of Laws

Because this case involves a contract between a Connecticut and an Illinois company transferring land in three states and involves several tort theories applying both to the contract formation and to the land, and because this case was filed in Connecticut and then transferred to Tennessee, the conflict of laws issues could be entirely unmanageable. However, the parties have ably briefed the conflicts questions.

■ This Court must apply the choice of law provisions that the Connecticut district court in which this case was first filed would apply. In *Van Dusen v. Barrack*, the Supreme Court held that when a case is transferred "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945, 962 (1964). In a diversity case, part of the state law that would have been applied is the choice of law rules of the forum state. *Klaxon Company v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1031, 85 L.Ed. 1477, 1490 (1941). The fact that this case was transferred by stipulation logically cannot affect the obligation of this Court to apply Connecticut choice of law rules. *See, e.g.,*

*Yoder v. Yamaha International Corporation*, 331 F.Supp. 1084, 1086 (E.D.Pa.1971) (transfer affects place of trial, not legal rights).

■ The Purchase Agreement, of which the Guaranty is a part, contains a choice of law provision. Paragraph 38 provides that the contract "shall be governed by and construed and enforced in accordance with the laws of the State of Connecticut." When the parties to a contract in good faith stipulate what substantive law will govern the contract, Connecticut will honor the parties' choice. *Gannett Co. v. Register Publishing Co.*, 428 F.Supp. 818, 824 (D.Conn.1977); *Pollak v. Danbury Mfg. Co.*, 103 Conn. 553, 131 A. 426 (1925); *Fairfield Lease Corp. v. Pratt*, 6 Conn.Cir. 537, 278 A.2d 154 (1971). Not only is the choice of law clause one of apparent good faith, but also Connecticut has a substantial relationship to the parties and the transaction, within the meaning of Restatement (Second) of Conflict of Laws § 187. Emhart, the buyer, is headquartered in Connecticut and Duracell does business there. Negotiations giving rise to the transaction occurred in Connecticut. The Guaranty which is a part of the Purchase Agreement should be governed by the same substantive law. *Schirm v. Auclair*, 597 F.Supp. 202 (D.Conn.1984).

Emhart has asserted four tort claims to which Connecticut's choice of law provisions must be applied. *See Van Dusen*, 376 U.S. at 639, 84 S.Ct. at 821, 11 L.Ed.2d at 962. Unfortunately, Connecticut seems to be in transition between the first Restatement's lex loci delicti rule and the Restatement Second's most significant relationship rule. Under the lex loci rule the law of the state where the tort occurred governs the substantive elements of the claim. *See, e.g., Gibson v. Fullin*, 172 Conn. 407, 374 A.2d 1061 (1977) (Florida guest statute governs action between Connecticut residents, one of whom was injured in Florida car wreck while guest of the other). However, in 1986, Connecticut decided that lex loci was not always satisfactory because it sometimes produced arbitrary and irrational results. *O'Conner v.*

*O'Conner,* 201 Conn. 632, 519 A.2d 13 (1986). The court emphasized that it was not abandoning lex loci for all purposes or "in all its manifestations." 519 A.2d at 21. Rather, the court held that the Restatement Second's guidelines should be incorporated into Connecticut law "as the governing principles for those cases in which application of the doctrine of lex loci would produce an arbitrary, irrational result." 519 A.2d at 22. Despite the difficulties that might be posed by Connecticut's transitional posture, the Court need not resolve which analysis Connecticut would use for each of the tort claims. Under either doctrine the choice is the same.

■ Connecticut law will govern the fraud, negligent misrepresentation and Connecticut Unfair Trade Practices Act claims. For the purposes of the lex loci analysis, fraud and negligent misrepresentation occur where the misrepresentation is made, not where the effect is felt. *Bailey Employment Systems, Inc. v. Hahn,* 655 F.2d 473 (2d Cir.1981); *Commonwealth Fuel Company v. McNeil,* 103 Conn. 390, 130 A. 794 (1925). The contract which contained the misrepresentations was made in Connecticut and therefore the misrepresentations were made in Connecticut. Although no Connecticut court has addressed the applicability of *O'Connor's* adoption of the Restatement Second to a fraud case, the result if *O'Connor* were applied is the same.

The facts underlying Emhart's fraud and negligent misrepresentation claims are most significantly related to Connecticut. The negotiations giving rise to the contract occurred principally in Connecticut. The contract was executed in Connecticut. The parties have bound themselves to Connecticut law for the purposes of contract interpretation. Some of the key misrepresentations are contained within the contract. Under the Restatement Second, Connecticut law would govern the fraud and misrepresentation claims.

■ Emhart's claim of CUTPA violation relies on elements of deceit similar to those in the fraud and misrepresentation claims.

Logically, this indicates that the same analysis under both lex loci and Restatement Second applies to the CUTPA claim as does to the deceit claims. Moreover, the choice of any other forum's interpretation of Connecticut's statute would be impracticable.

■ Emhart has also alleged that the four facilities were in a nuisance condition when transferred. Before *O'Connor* Connecticut applied lex loci to nuisance claims. In *Murray v. City of Milford,* 380 F.2d 468 (2d Cir.1967), the court held that when a New York plaintiff was injured in Connecticut by a nuisance in Connecticut, Connecticut would apply its own law to the claim. Under this lex loci analysis, the tort law of each state in which a nuisance is located would apply to that nuisance. Under *O'Connor,* the application of the most significant relationship test would yield the same result. The place of each nuisance has the most significant relationship with that alleged nuisance.

In addition to its state law claims, Emhart has alleged a CERCLA claim. Although the Court in *Van Dusen* was confronted only with state law claims, a number of courts have held that the *Van Dusen* logic must also apply to federal law claims. *See, e.g., Berry Petroleum Company v. Adams & Peck,* 518 F.2d 402 (2d Cir.1975); In re *Haven Industries, Inc.,* 462 F.Supp. 172 (S.D.N.Y.1978); *Oldfield v. Alston,* 77 F.R.D. 735 (N.D.Ga.1978); In re *Air Crash Disaster,* 399 F.Supp. 1106 (D.Mass.1975). *But see Satellite Financial Planning v. First National Bank,* 633 F.Supp. 386, 393–94 (D.Del.1986) (applied law of transferee circuit because it was well established); In re *Pittsburgh & L.E.P. Company,* 543 F.2d 1058, 1065 n. 19 (3d Cir.1976) (questioning theoretical foundations for applying *Van Dusen* to federal law claims). To the extent that the Sixth Circuit has a body of law under CERCLA, it is not apparently inconsistent with Second Circuit precedent. Therefore, the

Court will not resolve this difficult and conceptually troubling issue.[35]

### B. Breach of Purchase Agreement Indemnity and Guaranty

The indemnity and PCB provisions in the Purchase Agreement of July 1979 are unambiguous.[36] Duracell agreed to indemnify Emhart for any "obligation, liability, loss damage or expense ... incurred under or imposed by" any body of law pertaining to "health, safety or environmental protection" related to PCBs if the "obligation, liability loss, damage or expense" arose from "any act or omission by Seller, its employees or representatives prior to the Closing Date." This is the first promise of § 6. Duracell additionally and specifically accepted sole responsibility for all PCB residues or discharges which were not removed from any of the facilities by closing. This is the second promise of section 6. Both these obligations are expressly excepted from the contractual limitations periods.

### 1. Attorneys' Fees

■ Under the first promise, Duracell is liable to Emhart for investigation,[37] cleanup, lost profits, third party claims and attorney fees incurred under or imposed by health, safety or environmental laws related to PCBs to the extent these damages were occasioned by Duracell's action.

Duracell has argued that "any obligation, liability, loss, damage or expense" does not include attorneys' fees. The introductory language to § 6(g) states that Du-

racell will hold Emhart "harmless from and against any and all claims, obligations and liabilities and all costs, expenses and attorneys' fees incurred, based upon, or arising out of" the PCB promises in § 6. In Burr v. Lichtenheim, the Connecticut Supreme Court addressed for the first time the availability of attorneys' fees for enforcement of a contractual indemnity.[38] 190 Conn. 351, 460 A.2d 1290 (1983). The court stated that the "general rule is that, in the absence of express contractual terms to the contrary, allowance of fees is limited to the defense of the claim which is indemnified and does not extend to services rendered in establishing the right to indemnification." Id. at 1296. However, "encompassing language in the indemnity contract, usually specifically referring to attorney's fees" may create an express agreement to the contrary. Id. at 1297. Interpreting the indemnity at issue in Burr, the court held that the terms of the agreement limited attorney's fees to those incurred in defense of the Lichtenheim's claim and allowed no reasonable interpretation of liability for fees incurred in enforcing the indemnity.

The Court holds that the requirements for exception to the general rule have been met in this case. The introductory paragraph certainly contains encompassing language and does expressly refer to attorneys' fees. The language "incurred, based upon or arising out of" is far broader than the "incurred in connection with any action or proceeding brought to enforce in first refusal rights" language in Burr. See

---

**35.** The Van Dusen rule cannot apply to Duracell's suit for declaratory judgment under TSCA which was filed in Tennessee initially.

**36.** Even if the language were ambiguous the presumption against the drafter would not be appropriate. See Sturman v. Socha, 191 Conn. 1, 463 A.2d 527, 532 (1983) (presumption applies only if ambiguous). The record is clear that the PCB provisions were fully negotiated after being proposed and that Duracell and Dart elected to take the risk knowingly. Cf. Burritt Mutual Savings v. Transamerica Insurance Co., 180 Conn. 71, 428 A.2d 333, 357 (1980). (Insurance contracts will be construed against insurance company which has had "ample opportunity to note and to respond to the extensive and confusing case law").

**37.** Duracell has conceded, as it must, that it is liable for the reasonable costs of sampling and analysis. See Murray v. Bridgeport Hospital, 40 Conn.Sup. 56, 480 A.2d 610 (1984). Insofar as the sampling or analysis costs are unreasonable, Duracell is not liable. Reasonableness is reserved for the damages trial.

**38.** The indemnity in Burr provided that the seller of the realty would hold the buyer harmless

from any and all liabilities and expenses and damages incurred in connection with any action or proceeding brought to enforce Alexander Lichtenheim's and Katherine Lichtenheim's first refusal rights, if any, on the parcel of property conveyed to the grantee.
Burr, 460 A.2d at 1292.

note 38 *supra* (full text of *Burr* indemnity). The *Burr* indemnity was limited to one litigation; in this case the indemnity applies to any conceivable PCB related scenario.

### 2. *Temporary Shutdown of Waynesboro*

 For the losses under the first promise to be indemnified, they must be incurred under or imposed by a body of law pertaining to health, safety or environmental protection. Duracell has taken the narrow view throughout this litigation and the events leading up to it that the law involved is federal PCB regulation. Whatever the source of this view, it is not and cannot be the contractual language. Nor is it clear that Duracell's view would avail it much with regard to Waynesboro.

Reasonable actions taken in good faith to fulfill legal obligations or to avoid the risk of liability are "imposed by law" within the meaning of an indemnity. *East Coast Tender Service, Inc. v. Winzinger*, 759 F.2d 280, 286 (3d Cir.1985). *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1369 (5th Cir.1983). On the weekend of July 27, 1984 Emhart acted to avoid the risk of criminal liability under TSCA and to fulfill its OSHA obligation to investigate and remedy potential dangers in the workplace. *See Dunlap v. Rockwell International*, 540 F.2d 1283, 1292 (6th Cir.1976). Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.;* Occupational Safety and Health Act, 29 U.S.C. § 654.

Emhart discovered that PCBs were present in and on the equipment at Waynesboro. EPA regulations under TSCA prohibit the use of "any PCB, or any PCB item, regardless of concentration, in any manner other than in a totally enclosed manner." 40 CFR § 761.3. Use of contaminated equipment would violate this regulation. Further, the apparent degree of contamination was high enough for Dr. Marshall to express concern about even short term exposure.[39] Both the OSHA general duty clause[40] and the common-law duty to provide a reasonably safe place to work required prompt action by Emhart. *See Hamilton v. Bean*, 745 F.2d 1034, 1036 (6th Cir.1984) (duty is personal, continuous, and nondelegable); *Overstreet v. Norman*, 44 Tenn. 343, 314 S.W.2d 47, 50 (1958). In light of the perceived risk, Emhart's shutdown decision was reasonable. The decision to comply with the substantial risk notification requirement of TSCA was also reasonable. 15 U.S.C. § 2607(e). The information available to Emhart about the degree of contamination certainly "reasonably supports the conclusion" that Emhart's products might be so PCB contaminated as to present "a substantial risk of injury to health or the environment." *Id.*

Further, the actions of Emhart both immediately before and after the shutdown negate any implication of bad faith. Emhart kept Duracell fully notified and informed about the extent of contamination and Emhart's response to it. Contemporaneous notes indicate that Emhart's goals were to reopen as soon as possible and to minimize the impact on its labor pool. Emhart purchased capacitors from its competitors in order to fill orders and retain its market share. Every day of forced shutdown cost Emhart money and Emhart responded by trying to minimize that impact.

---

**39.** Mr. Saylor's statement about "not being a panic situation" was based on only some of the samples available to Dr. Marshall and Emhart by the end of July. Therefore, his position was not actually contrary to Dr. Marshall's.

**40.** 29 U.S.C. § 654(a)(1). The general duty clause requires employers to

furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees.

*Id.* The general duty clause imposes a separate, additional duty on employers, beyond the numerical or specific standards under section 654(a)(2). "[I]f an employer knows that a specific standard will not protect his workers against a particular hazard, his duty under section 5(a)(1) [general duty clause] will not be discharged no matter how faithfully he observes the standard. Scienter is the key." *Internation Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. General Dynamics Land Systems Division*, 815 F.2d 1570, 1577 (D.C.Cir.1987).

Therefore, the Court holds that the temporary shutdown led to losses "incurred under or imposed by" law.

### 2. Permanent Closing

■ After further investigation Emhart negotiated a clean-up standard of 10ug/100cm$^2$ for all areas except the cafeteria with TOSHA and received an EPA recommendation of a 10ug/100cm$^2$ clean-up. The EPA recommendation was received by Emhart on August 30, 1984. TOSHA's concurrence was received on October 1, 1984. After October 1 the actions of Emhart to pursue a lower clean-up value were unreasonable.[41] Although Emhart had different concerns and motivations than Duracell's, the indemnity does not require that Duracell underwrite the most economically productive solution to the Waynesboro PCB problem. *See* note 33 *supra.* Emhart's independent decision that a third cleaning of Waynesboro was a poor use of money which could better be used to enhance production capacity is not a risk Duracell agreed to bear. The decision was not caused or "incurred under or imposed by" law. Therefore, it is outside of the scope of the indemnity. Duracell is obligated to pay for all clean-up to the negotiated levels.[42] Part of the cost of clean-up is the additional shutdown period that will be required to prepare plans and effect a clean-up. The lost profits and expenses for this period will be calculated as if on October 1, Emhart had proceeded with clean-up plans.

■ An attempt to shift the cost of a decision to close permanently to Duracell is to expand the indemnity beyond its terms. *Cf. American Export Isbrandtsen Lines Inc. v. United States,* 390 F.Supp. 63, 68 (S.D.N.Y.1975) ("An indemnitee has a duty to act reasonably under all the circumstances so as to protect the indemnitor against

liability"). Were it not possible to discount the effect of the decision to close permanently in calculating damages, the indemnity might be considered discharged altogether. *See, Hiern v. St. Paul-Mercury Indemnity Co.,* 262 F.2d 526, 529 (5th Cir. 1959) (quoting *United States Fidelity and Guaranty Co. v. Putfark,* 180 La. 893, 158 So. 9 (1934)). The Court is convinced, however, that the Connecticut courts would not work a forfeiture of the indemnity protection when the impact of Emhart's entirely reasonable action in its own interest is easily removed from the elements of damage. *See Fairfield v. D'Addario,* 149 Conn. 358, 179 A.2d 826 (1962). *Cf. Danpar Associates v. Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 428 A.2d 708 (1980) (indemnitor's failure to honor duty after demand may relieve indemnitee of duty to indemnitor, if indemnitee continues to act in good faith); *Alderman v. Hanover Insurance Group,* 169 Conn. 603, 363 A.2d 1102 (1975) (reasonable and in good faith).

### 4. Abandonment of the Equipment

■ Just as Duracell is liable for the cost of cleaning the plant, Duracell is liable for the cost of cleaning the equipment. Just as Duracell is not liable for the decision to close permanently, Duracell is not liable for the decision to abandon the equipment. Part of the cost of cleaning the equipment is any damage to the equipment from cleaning.

### 5. Third Party Suits

■ Emhart has been named as a defendant in two other lawsuits pending in this Court: *Brewer v. Monsanto,* 1–85–0071, and *Brewer v. Ravan,* 1–86–0061. These, plus *In re Emhart Industries,* No. TSCA–IC–85–0001 (EPA March 12, 1985) and the Notice of Lien Under Hazardous

---

**41.** If in the course of the clean-up TOSHA, OSHA, or the EPA revises the clean-up requirements to a lower level, the cost of meeting that lower level will also be borne by Duracell.

**42.** The use of TCE by both Duracell and Emhart is of no relevance to the clean-up cost obligation. Given the extent of ground contamination from leaking tanks and drums and of build-

ing contamination from impregnation room vapors, the effect of TCE use is de minimus. However, any clean-up of TCE that may be required is not covered by the indemnity. If a type of cleaning or an area of clean-up is mandated solely by TCE contamination, that will be Emhart's responsibility.

Waste Management Act of 1983 filed by the Tennessee Department of Health and Environment July 17, 1986, are all claims against Emhart "arising out of" the presence of PCBs at the Waynesboro plant. As such, Emhart's costs, attorneys' fees, and ultimate liability are all within the indemnity. The indemnity obligation is continuous in nature and therefore Duracell must indemnify Emhart under the terms of the contract for any and all future claims against Emhart arising out of the presence of PCBs at Waynesboro.

■ Emhart's use of TCE may have caused independent health effects and may have increased the PCB exposure by covaporization and mobilization. *See* text accompanying note 16 *supra*. To the extent, and that precise extent is reserved for the damages trial, that TCE exposure may have exacerbated the damages in the third party actions, Duracell is not liable under the indemnity. Similarly, to the extent that the injuries in these suits were caused by Emhart's actions, unrelated to the contaminated nature of the facilities when Duracell transferred them, Emhart alone will be liable.

### 6. *Other Facilities*

■ Under the indemnity Duracell is liable to Emhart for expenses at any facility, not just Waynesboro. Emhart's decision to investigate the other capacitor facilities for PCB contamination was reasonable under the circumstances. Given what Emhart had discovered about PCBs at Waynesboro, prudence required some investigation to avoid liability. This investigation falls under the "imposed by law" aspect of the indemnity. *See* note 37, *supra; see also East Coast Tender Service, Inc. v. Winzinger*, 759 F.2d 280 (3d Cir. 1985); *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir.1983). The levels of contamination at Indianapolis, Greencastle, and Glasgow were much lower than at Waynesboro. Nonetheless, the levels were over the $10ug/100cm^2$ that Emhart had already been directed to pursue at Waynesboro.

■ Emhart therefore had scienter within the meaning of *General Dynamics*, 815 F.2d at 1577, and 24 U.S.C. § 654(a)(1). *See* note 40, *supra*. Duracell took the position at trial that numerical standards of clean-up for these facilities were not appropriate, because any normal, housekeeping-type decontamination would reduce the PCB levels below the limits of detection. To the extent that post clean-up testing reveals this to be true, a normal housekeeping-type clean-up is obviously sufficient under the indemnity. If, however, PCBs remain at a legally unacceptable level, Emhart shall undertake and Duracell shall pay for clean-up efforts to reduce PCB contamination to levels satisfactory to the state agencies involved and to the EPA.

### 7. *Control of the Clean-Up Efforts*

■ Duracell has argued that it, not Emhart, should control all clean-up efforts. Duracell bases this argument on the term "sole responsibility" in the indemnity. Considering the contract as a whole and the circumstances the contract clearly contemplates, the Court holds that "control" is not a reasonable gloss on "responsibility." The Mallory Components Group was transferred to Emhart as a going concern. Each facility was in use and was anticipated to remain in use. The disruption occasioned by allowing Duracell free access and dominion over operating production facilities was not contemplated or required by the contract. Nor does the later shutdown of Waynesboro affect the meaning of the contract as drafted. The Connecticut Supreme Court has recently construed the term "responsible" in a contract to mean financially responsible. *Sturman v. Socha*, 191 Conn. 1, 463 A.2d 527 (1983). This construction is sound and in accordance with the contract as a whole. Further, Duracell's refusal to perform as required by the indemnity would release Emhart from any covenant to allow Duracell to control clean-up that might be read into the contract. Under Connecticut law an indemnitee can fulfill his legal or moral obligations despite a covenant to the contrary if the indemnitor has breached. So long as the indemnitee's actions are not unreason-

able or in bad faith, even an express covenant will not preclude recovery. *Alderman v. Hanover Insurance Group*, 169 Conn. 103, 363 A.2d 1102 (1975).

Emhart must make its expenditures in good faith, and, if Duracell chooses, it may attack the reasonableness of expenditures at the damages phase of the trial.

### 8. *Dart's Guaranty*

█ Dart guaranteed Duracell's obligations to Emhart. The guaranty, like the purchase agreement, is unambiguous. Emhart made timely and repeated demands to both Dart and Duracell that they honor their respective obligations. Duracell not only failed to do so, but denied liability under the indemnity. Dart guaranteed "absolutely and unconditionally the prompt and complete performance" of the indemnity. When Duracell failed to perform Dart was required by its own promise to "promptly remedy such default." Therefore, Dart must pay any loss Duracell has not or does not. *See Pero Building Co. v. Smith*, 6 Conn.App. 180, 504 A.2d 524 (1986) (the scope and meaning of unambiguous contract is a question of law).

### C. *Tort Claims*

### 1. *Torts of Deceit: Fraud, Misrepresentation and CUTPA*

█ Emhart has alleged two misrepresentations by Duracell in connection with the 1979 sale of the Mallory Components Group. The first is that Duracell misrepresented "that sufficient measures had been taken to prevent, mitigate or remove PCB contamination at the Waynesboro plant." There is no evidence of any representation, oral or written, about the extent of PCB contamination at Waynesboro. Therefore, this claim of misrepresentation must fail.

█ The second misrepresentation alleged by Emhart is that "PCBs were not used, located, stored, distributed at or discharged from any facility other than the Waynesboro plant." Duracell did make this misrepresentation. However, the contract contains a three year limitation period for misrepresentations. Section 26 of the Purchase Agreement. Section 26 does not affect Emhart's claim for indemnification; it does, however, impose a three year limit on the tort claims. The parties allocated the risk of misrepresentation among themselves by contract. Both tort and contract remedies were available for three years; after that the more limited remedy of contract indemnity was preserved. It is the policy of Connecticut to honor contractual limitations periods that allocate risks based on the parties willingness to pay for greater or lesser protection. *See Monteiro v. American Home Assurance Co.*, 177 Conn. 781, 416 A.2d 1189 (1979). The three year time limit of section 26 of the contract therefore bars any claim by Emhart based on the inaccuracy of Exhibit 10(aa).[43]

All three of the deceit torts alleged require a misrepresentation and all three require suit within three years. Because of the Court's disposition of these elements, it is not necessary to pursue the torts' other diverse elements.

### 2. *Nuisance*

█ Although the substantive elements of a nuisance claim are governed by the law of the place the land is located, the procedural elements are governed by lex loci. This Court under *Van Dusen, supra* must apply the law that the Connecticut court in which this case was filed would apply. The Connecticut federal court, being bound by Connecticut state law would apply the Connecticut statute of limitations to the various nuisance claims. *Commonwealth Fuel v. McNeil*, 103 Conn. 390, 130 A. 794 (1925). Under Connecticut law Emhart could not bring a nuisance claim

---

**43.** By similar token, the contract does not provide any extension of time to sue for tort. Therefore, the Connecticut three year tort statute of limitations would also bar the tort claims. Conn.Gen.Stat. § 52–577. The CUTPA contains a three year statute of limitations. Conn.Gen. Stat. § 42–110g(f). *See Van Dusen v. Barrack,*

*supra* (transferee court must aply the law transferor court would apply). The Connecticut federal court would apply the Connecticut statute of limitations as a matter of procedural law. *Commonwealth Fuel Co. v. McNeil,* 103 Conn. 390, 130 A. 794 (1925).

against the vendor Duracell more than three years after the sale. Conn.Gen.Stat. § 52–577.

### D. *Comprehensive Environmental Recovery Corporation and Liability Act (CERCLA)*

Sections 107(a)(2) and 107(a)(4)(B) of CERCLA provide that, in the event of a "release or threatened release" of "hazardous substances" which causes the incurrence of response costs, any person who at the time of "disposal" owned a facility at which hazardous substances were disposed shall be liable for any "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. §§ 9607(a)(2)(B) and 9607(a)(4)(B). CERCLA defines release as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment." 42 U.S.C. § 9601(22).

■■■■ The leaking drums of waste and leaking underground tanks and the continued leaching and seepage from earlier spills at the Waynesboro plant are a release or threatened release. *See United States v. Mirabile*, 15 ELB (ELT) 20992 (E.D.Pa. Sept. 4, 1985) [Available on WESTLAW, DCT database] (decomposing and leaking drums constitute release or threatened release). PCBs are hazardous substances under CERCLA. CERCLA defines hazardous substances as "any substance designated pursuant to section 1321CA of Title 33." 42 U.S.C. § 9601(14)(A) & (D). Congress designated PCBs as a "toxic pollutant" under the Clean Water Act, 33 U.S.C. § 1317 in 1977. In 1978, the EPA designated PCBs as a hazardous substance under 33 U.S.C. § 1321. Therefore, PCBs are "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).

■■■ CERCLA defines "response" or "respond" as "remove, removal, remedy and remedial action." 42 U.S.C. § 9601(25). Emhart's hiring of experts to investigate the extent of the PCB contamination at the Mallory Components Group facilities, to take and analyze samples, and to remove PCB contamination are "response costs" within the meaning of CERCLA.

■■■■ Emhart and Duracell are persons within the meaning of CERCLA, 42 U.S.C. § 9601(21). Disposal is

the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 9601(29) (incorporating 42 U.S.C. § 6903(3)). Duracell owned the Mallory Component Group facilities at the time of disposal. At Waynesboro, the spilling of PCBs during their use by Duracell in the manufacturing process, as well as the dumping of PCBs outside the plant, the flow of PCBs into the Green River, and the leaching of PCBs through the soil and into the groundwater during Duracell's ownership all constitute disposal under CERCLA.

The parties have stipulated that the capacitor plants at Waynesboro, Greencastle and Glasgow and the Indianapolis complex are all facilities under CERCLA, 42 U.S.C. § 9601(9). The leaking, spilling and emitting of PCBs at Glasgow, Greencastle and Indianapolis while those facilities were owned by Duracell constituted disposal.

■■■■ Therefore, the Court declares that Duracell is liable to Emhart for all costs incurred now or in the future by Emhart consistent with the national contingency plan. The Court further declares that Duracell is not liable to Emhart for response costs attributable to Emhart's use of TCE at Waynesboro. At the damages trial Emhart will be entitled to prove the amount of its costs that were incurred consistently with the National Contingency Plan, for Waynesboro, Greencastle, Glasgow and Indianapolis. Duracell will be entitled to prove and avoid liability for response costs directly attributable to Emhart's use to TCE.

## IV. Conclusion

For the reasons stated the Court holds that Duracell and Dart are liable to Emhart for the cost of clean-up of the facilities and equipment transferred in the sale, for the consequential damages measured by the time necessary to effect a clean-up, for the costs attendant to enforcing the contract, and for a portion of the costs of the third party actions. Duracell is liable to Emhart for CERCLA response costs. The amount of these liabilities will be determined at the damages trial.